325 P.3d 600

**UNITED PUBLIC WORKERS, AFSCME, LOCAL 646, AFL–CIO, Petitioner/Plaintiff–Appellant,**

v.

**Neil ABERCROMBIE,[1] Governor, State of Hawai'i; Kalbert K. Young, Director, Department of Budget and Finance, State of Hawai'i; Barbara A. Krieg, Director, Department of Human Resources Development, State of Hawai'i; Ted Sakai, Director, Department of Public Safety, State of Hawai'i,[2] Respondents/Defendants–Appellees.**

**No. SCWC–12–0000505.**

Supreme Court of Hawai'i.

Feb. 28, 2014.

---

1. During the pendency of this appeal, Neil Abercrombie, Governor of the State of Hawai'i, succeeded Linda Lingle. Thus, pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 43(c), Abercrombie has been substituted automatically for Lingle in this case.

2. Kalbert K. Young, Director, Department of Budget and Finance, State of Hawai'i; Barbara A. Krieg, Director, Department of Human Resources Development, State of Hawai'i; and Ted Sakai, Director, Department of Public Safety, State of Hawai'i have been substituted as parties to this appeal pursuant to HRAP Rule 43(c). UPW also listed Linda Lingle's Chief Policy Advisor, Linda Smith, as a Defendant. This title does not exist in Governor Abercrombie's current cabinet.

Rebecca Covert, Herbert R. Takahashi, Honolulu, and Davina W. Lam, for petitioner.

Richard H. Thomason, for respondent.

RECKTENWALD, C.J., NAKAYAMA, and McKENNA, JJ., with ACOBA, J., Concurring and Dissenting, with Whom POLLACK, J. Joins.

Opinion of the Court by McKENNA, J.

## I. Introduction

This case concerns the application of the primary jurisdiction doctrine by the Intermediate Court of Appeals ("ICA") to a lawsuit filed in circuit court by the United Public Workers, AFSCME, Local 646, AFL–CIO ("UPW"), on behalf of the employees ("Employees") it represents. UPW presents the following question: "Whether the ICA erred by ordering the circuit court to stay this case under the doctrine of 'primary jurisdiction' even though the claims are within the original jurisdiction of the circuit courts and do not present issues committed to the specialized administrative expertise of the Hawai'i Labor Relations Board."

UPW sought relief in the Circuit Court of the First Circuit ("circuit court") alleging that then-Governor Lingle and members of her administration retaliated against UPW members for filing a lawsuit opposing her 2009 statewide furlough plan. In addition, UPW alleged that the State was unlawfully privatizing positions historically and customarily performed by civil servants under the merit system. UPW's retaliation claims were brought under (1) the Hawai'i Whistleblowers' Protection Act ("HWPA"),[3] and (2) article I, section 4 of the Hawai'i Constitution ("Free Speech Clause" or "Free Speech retaliation claim")[4]. UPW's privatization claims were brought under (1) article XVI, section 1 of the Hawai'i Constitution,[5] and (2) Hawai'i Revised Statutes ("HRS") § 76–43 (Supp. 2010).[6]

We hold that UPW's retaliation claims are originally cognizable in the circuit courts; however, the ICA correctly ruled that pursuant to the doctrine of primary jurisdiction, the enforcement of UPW's retaliation claims requires the resolution of issues that have been placed within the special competence of the Hawai'i Labor Relations Board ("HLRB") under HRS Chapter 89. The ICA also correctly ruled that the circuit court should have stayed rather than dismissed the UPW's retaliation claims pending the HLRB's determination of issues within UPW's claims that were within the HLRB's special competence. We hold that pursuant to *Konno v. County of Hawai'i*, 85 Hawai'i 61, 937 P.2d 397 (1997), however, the primary jurisdiction doctrine does not apply to UPW's privatization claims.

Accordingly, we affirm the ICA's judgment on appeal vacating the circuit court's "Order Granting Defendants' Second Motion to Dismiss Plaintiff's Complaint Filed September 16, 2009" and May 15, 2012 Final Judgment. We disagree, however, with the ICA's remand instructions to the extent that it ordered the circuit court to stay UPW's privatization claims. We agree that the circuit court must stay the retaliation claims pursuant to the primary jurisdiction doctrine, but the primary jurisdiction doctrine does not apply to UPW's privatization claims; therefore, we instruct the circuit court to proceed consistent with this opinion.

## II. Background

### A. Factual Background[7]

#### 1. Attempted Furlough and Injunction

On June 1, 2009, then-Governor Linda Lingle announced that state employees would be furloughed three days per month for two years to allow the state to avoid having to lay off employees. On June 16, 2009, UPW filed a complaint in the circuit court ("Furlough Lawsuit") "for violations of state law under Article XIII, Section 2,[8] and other State Constitution provisions," and sought injunctive

---

3. In relevant part, the HWPA prohibits an employer from discharging, threatening, or otherwise discriminating against an employee regarding the employee's compensation, terms, conditions, location, or privileges because:

   (1) The employee, or a person acting on behalf of the employee, reports or is about to report to the employer, or reports or is about to report to a public body, verbally or in writing, a violation or a suspected violation of ... [a] law, rule, ordinance, or regulation, adopted pursuant to law of this State, a political subdivision of this State, or the United States[.]

   HRS § 378–62 (2011).

4. "No law shall be enacted respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech or of the press or the right of the people peaceably to assemble and to petition the government for a redress of grievances." Haw. Const. art. I, § 4.

5. "The employment of persons in the civil service, as defined by law, of or under the State, shall be governed by the merit principle." Haw. Const. art. XVI, § 1.

6. "When it is necessary to release employees due to lack of work, lack of funds, or other legitimate reasons, employees with permanent appointments in civil service positions shall have layoff rights. Layoffs shall be made in accordance with procedures negotiated under chapter 89 or established under chapter 89C, as applicable." HRS § 76–43.

7. These facts are from UPW's complaint to the circuit court and are undisputed by the Defendants.

8. "Persons in public employment shall have the right to organize for the purpose of collective bargaining as provided by law." Haw. Const. art. XIII, § 2.

relief to enjoin the state from implementing the furloughs.[9] On July 2, 2009, the circuit court[10] concluded that the defendants had violated the State Constitution by attempting to impose the furloughs without collective bargaining, and granted UPW's injunction, enjoining the unilateral statewide furloughs.

### 2. Reduction in Force Announcement

Soon thereafter, on July 17, 2009, Marie Laderta (Defendant Laderta), Director of the Department of Human Resources Development, notified various public employees that their names would be included on layoff lists. Approximately 216 UPW employees were on the list. On July 23, 2009, Clayton Frank ("Defendant Frank"), Director of the Department of Public Safety, notified UPW of an impending layoff due to the closure of the Kulani Correctional Facility. On August 4, 2009, Defendant Lingle announced a decision to implement a reduction in force ("RIF") that would discharge approximately 1,100 State employees.

### 3. Privatization

UPW alleged that on June 8, 2009, UPW requested that Defendants Lingle and Laderta terminate all contracts for services that have historically and customarily been performed by civil servants in bargaining units 1 and 10. UPW alleged that the Defendants refused.[11]

UPW also alleged that Defendants refused to negotiate over the (1) decision to close Kulani Correctional Facility, and (2) implementation of that decision. On August 3, 2009, Defendant Frank informed the inmates at Kulani of their relocation by the end of September 2009. UPW alleged that the Department of Public Safety then subcontracted with private contractors to house approximately 2,000 Hawai'i inmates on the mainland.

### B. Procedural History

#### 1. HLRB Prohibited Practice Complaint

On August 27, 2009, UPW filed an amended complaint with the HLRB ("HLRB Complaint") against Defendants Laderta, Lingle, and Frank ("Defendants").[12] The HLRB Complaint alleged a number of violations under HRS § 89–13(a) ("prohibited practice violations"). In relevant part, the HLRB Complaint alleged that the Defendants: (1) violated HRS § 89–13(a)(1) when Defendant Lingle interfered, restrained, and coerced employees in their exercise of statutory and constitutional rights by threatening mass layoffs and the shutdown of programs; (2) violated HRS § 89–13(a)(3) when Defendants discriminated regarding terms and conditions of employment to discourage membership in an employee organization through threats to job security, implementation of RIF, layoffs, and discharges; (3) violated HRS § 89–13(a)(5) by refusing to bargain collectively in good faith over furloughs as an alternative to layoffs, and for unilaterally implementing procedures and criteria for RIF displacements, and discharges of bargaining unit employees; (4) violated HRS § 89–13(a)(7) by refusing to comply with provisions of Chapter 89, including HRS §§ 89–3[13] and 89–9(a)[14], (c)[15], and

---

9.  On June 18, 2009, UPW amended its complaint restating its claims for violations of the state constitution.

10.  The Honorable Karl K. Sakamoto presided.

11.  UPW does not provide any examples of Defendants' alleged unlawful privatization of civil service positions other than Kulani Correctional Facility.

12.  The original complaint contained "prohibited practice" allegations against Defendant Laderta only.

13.  HRS § 89–3 (Supp.2008) states:

Employees shall have the right of self-organization and the right to form, join, or assist any employee organization for the purpose of bargaining collectively through representatives of their own choosing on questions of wages, hours, and other terms and conditions of employment, including retiree health benefit contributions, and to engage in lawful, concerted activities for the purpose of collective bargaining or other mutual aid or protection, free from interference, restraint, or coercion. An employee shall have the right to refrain from any or all of such activities, except for having a payroll deduction equivalent to regular dues remitted to an exclusive representative as provided in section 89–4.

(d) [16]; and (5) violated HRS § 89–13(a)(8) by violating the terms of the unit 1 and 10 collective bargaining agreements.

The HLRB entered its Findings of Fact and Conclusions of Law on October 23, 2009. In relevant part, the HLRB found: (1) the record indicated that the State at all relevant times was facing a severe fiscal crisis that required it to balance its budget in the face of ever-increasing revenue shortfalls; (2) Defendant Lingle's consideration of layoffs of public employees as a means of addressing the predicted revenue shortfall preceded the filing of grievances or civil lawsuits by UPW; (3) the State had presented a legitimate, non-discriminatory, and nonretaliatory reason for

its decision to lay off workers, and the Union had not presented evidence to rebut the State's assertions (the decline of revenues) or demonstrated that the stated reason was merely pretextual.

### 2. Circuit Court Complaint

Before the HLRB had issued its findings, UPW filed a complaint in the circuit court ("First Circuit Complaint") on September 16, 2009, alleging that Defendants' actions: (1) constituted acts of retaliation, reprisal, and intimidation in violation of the HWPA; (2) violated Employees' rights guaranteed by the Free Speech Clause; (3) violated the merit principle [17] mandated by article XVI, section

---

14. HRS § 89–9(a) (Supp.2008) states:

The employer and the exclusive representative shall meet at reasonable times, including meetings sufficiently in advance of the February 1 impasse date under section 89–11, and shall negotiate in good faith with respect to wages, hours, the amounts of contributions by the State and respective counties to the Hawaii employer-union health benefits trust fund or voluntary employees' beneficiary association trust to the extent allowed in subsection (e), and other terms and conditions of employment that are subject to collective bargaining and that are to be embodied in a written agreement as specified in section 89–10, but the obligation does not compel either party to agree to a proposal or make a concession; provided that the parties may not negotiate with respect to cost items as defined by section 89–2 for the biennium 1999 to 2001, and the cost items of employees in bargaining units under section 89–6 in effect on June 30, 1999, shall remain in effect until July 1, 2001.

15. HRS § 89–9(c) (Supp.2008) states:

Except as otherwise provided in this chapter, all matters affecting employee relations, including those that are, or may be, the subject of a rule adopted by the employer or any director, shall be subject to consultation with the exclusive representatives of the employees concerned. The employer shall make every reasonable effort to consult with exclusive representatives and consider their input, along with the input of other affected parties, prior to effecting changes in any major policy affecting employee relations.

16. HRS § 89–9(d) (Supp.2008) prohibits negotiation of matters of classification, reclassification, benefits of but not contributions to the Hawai'i employer-union health benefits trust fund or voluntary employees' beneficiary association trust; recruitment; examination; initial pricing; and retirement benefits except as provided in HRS § 88–8(h) (Supp.2008). In addition, this section

prohibits agreeing on any proposals that would be inconsistent with the merit principle, the principle of equal pay for equal work pursuant to section 76–1, or agreeing on proposals that would interfere with a number of rights and obligation of a public employer listed in HRS §§ 89–9(d)(1)–(d)(8).

17. UPW alleged the following regarding Defendants' violations of merit principles:

89. In *Konno v. County of Hawai'i*, 85 Hawai'i 61, 937 P.2d 397 (1997), the Hawaii Supreme Court held that the contracting out or privatization of services which have historically and customarily been performed by civil servants represented by UPW violates the merit principle.

90. On November 20, 2002 in the Matter of the Arbitration Between the *United Public Workers, AFSCME, Local 646, AFL–CIO v. County of Hawaii*, contracting out or privatization of bargaining unit work was found to violate, inter alia, the constitutional merit principle. Said award was confirmed by the circuit court in S.P. No. 02–1–0514 and constitutes a final judgment which is binding on all public employers who are parties to the unit 1 and 10 collective bargaining agreements.

91. The services performed by bargaining unit 1 and 10 employees in positions which are being abolished by the Defendants have historically and customarily been performed by civil servants under the merit system.

92. On June 8, 2009 Defendants Lingle and Laderta were requested by UPW to terminate all contracts for services which have historically and customarily been performed by civil servants in bargaining units 1 and 10 no later than June 30, 2009, and to cease and desist from undermining the job security of civil servants contrary to the merit principle.

93: On and after June 30, 2009 Defendants have refused to terminate contracts which are contrary to public policy in contravention of

1 of the Hawai'i Constitution; and (4) violated Employees' rights under HRS § 76–43 by "refusing to negotiate the criteria, procedures, timing, and manner of handling mass layoffs for reasons other than 'lack of work' or 'lack of funds' with UPW prior to unilateral implementation of the layoffs, reductions in force, and discharges of unit 1 and 10 employees."[18]

Defendants then filed a Motion to Dismiss the First Circuit Complaint on the grounds that: (1) UPW did not identify any "employees" protected by HWPA, and UPW is not an employee itself; (2) UPW's complaints did not include any facts that could "underlie a freestanding constitutional claim premised on access to the courts"; (3) this court in *Konno v. County of Hawai'i*, 85 Hawai'i 61, 70, 937

P.2d 397, 406 (1997) had already held, "the Hawai'i Constitution does not establish an independently enforceable right to the protection of merit principles"; and (4) UPW's allegations under HRS § 76–43 are premised on the requirements of Chapter 89, Hawaii's collecting bargaining law; therefore, the HLRB had exclusive original jurisdiction over such complaints. The circuit court[19] denied Defendants' motion in its entirety.

Two years later, on September 14, 2011, Defendants filed a second Motion to Dismiss in the circuit court on the basis that this court had recently clarified that the HLRB had "exclusive original jurisdiction over the controversy" in *Hawai'i Government Employees Association v. Lingle* ("*HGEA*"), 124 Hawai'i 197, 239 P.3d 1 (2010).[20] On January

---

Article XVI, Section 1 of the Hawaii State Constitution.

18. UPW alleged the following regarding Defendants' violations of civil service laws:

96. HRS Chapters 76 and 77 require that all blue collar, non-supervisory positions and institutional, health and correctional positions within the State of Hawaii, to be governed by the merit principles and that employees be hired and retained in accordance with the provisions thereof, unless specifically exempt under HRS § 76–16.

97. It is a fundamental requirement of the merit principle under Section 76–1, HRS, that civil servants be afforded reasonable job security.

98. HRS § 76–16 defines the merit system as follows:

§ 76–16 Civil service and exemptions.
. . .

(b) The civil service to which this chapter applies shall comprise all positions in the State now existing or hereafter established and embrace all personal services performed for the State, except the following:
. . .

(2) Positions filled by persons employed by contract where the director of human resources development has certified that the service is special or unique or is essential to the public interest and that, because of circumstances surrounding its fulfillment, personnel to perform the service cannot be obtained through normal civil service recruitment procedures. Any such contract may be for any period not exceeding one year; . . .

99. At no time has Defendant Laderta certified pursuant to Section 76–16(b)(2), HRS, for exemption the services performed by private contractors or otherwise authorized contracting out in units 1 and 10.

100. The contracting out and privatization of corrections work by Defendants is not justified under Section 76–16, HRS, when unit 1 and 10 employees are laid off, displaced, discharged, and subject to other adverse actions by Defendants.

101. Section 76–43, HRS, affords to employees with permanent appointments in civil service positions rights under the civil service laws as follows: Whenever it is necessary to release employees due to lack of work, lack of funds, or other legitimate reasons, employees with permanent appointments in civil service positions shall have layoff rights. Layoffs shall be made in accordance with procedures negotiated under chapter 89 or established under chapter 89C, as applicable.

102. Defendants violated the rights of employees under Section 76–43, HRS, by refusing to negotiate the criteria, procedures, timing, and manner of handling mass layoffs for reasons other than "lack of work" or lack of "funds" with UPW prior to unilateral implementation of the layoffs, reductions in force, and discharges of unit 1 and 10 employees.

103. Defendants, by the foregoing acts, have abrogated the Civil Service Laws of the State of Hawaii.

19. The Honorable Derrick H.M. Chan presided.

20. In *HGEA*, two unions sought relief under both statutory and constitutional provisions to enjoin the Governor from unilaterally imposing furloughs or new layoff procedures on public employees. This court held that the HLRB had exclusive original jurisdiction over the statutory issues raised in the unions' complaint, and that the circuit court had erred in addressing the constitutional issues without first giving the HLRB the opportunity to address the statutory questions.

17, 2012, this court published *Hawai'i State Teachers Association v. Abercrombie* ("*HSTA*"), 126 Hawai'i 318, 271 P.3d 613 (2012),[21] which further clarified and affirmed our decision in *HGEA*.

On February 15, 2012, the circuit court[22] granted Defendants' second Motion to Dismiss and dismissed all claims based on its conclusion that the circuit court lacked jurisdiction. The circuit court found that the underlying facts in UPW's First Circuit Complaint essentially mirrored those alleged by UPW in the "prohibited practice" claims before the HLRB. It concluded that HRS § 89–14 provided HLRB with exclusive original jurisdiction over controversies implicating prohibited practices, and therefore, "it would be wholly inconsistent with HLRB's exclusive, original jurisdiction for the First Circuit to hear the same underlying factual disputes and allegations and create the possibility of inconsistent judgments."

The circuit court also concluded that the statutory scheme required that HLRB be given the opportunity to address the allegations in UPW's prohibited practice complaint. The circuit court would then review HLRB's decision in its appellate capacity. The circuit court also concluded that the additional claims raised in the First Circuit Complaint, not included in the HLRB complaint, were essentially prohibited practices, and stated that it lacked "primary subject matter jurisdiction" over those claims because exclusive, original jurisdiction rested with the HLRB.

Finally, to the extent that the First Circuit Complaint raised constitutional and statutory claims over which the HLRB lacked subject matter jurisdiction, the circuit court concluded that under *HGEA*, the HLRB had to be given the opportunity to resolve the claims within its jurisdiction before a court could consider the constitutional claims in its appellate capacity.[23] The circuit court further concluded that the claims could be rendered

moot if HLRB ruled against UPW on the key factual and legal questions of whether the Governor's reason for instituting layoffs were: 1) premised upon a true fiscal exigency, and were within her unilateral management powers under HRS Chapter 89, or 2) premised upon an improper desire to retaliate against UPW members for engaging in conduct specifically protected by HRS Chapter 89.

As for the "statutory claims," the circuit court concluded that "allowing parallel litigation in the circuit court while the HLRB proceeding was ongoing would both undercut the HLRB's exclusive original jurisdiction and create a risk of inconsistent judgments." The circuit court then dismissed all of UPW's claims based on a lack of jurisdiction.

### D. ICA Memorandum Opinion

The ICA issued a Memorandum Opinion vacating the circuit court's judgment dismissing UPW's First Circuit Complaint, and remanded the case with instructions to stay the action pursuant to the primary jurisdiction doctrine, so that the parties could pursue appropriate administrative remedies before the HLRB. *UPW v. Lingle*, No. CAAP–12–0000505, 129 Hawai'i 451, 303 P.3d 1228 (Haw.App. June 18, 2013) (mem.).

The ICA essentially agreed with the circuit court that the controversy presented to the circuit court raised issues within the HLRB's exclusive jurisdiction over prohibited practice controversies. The ICA concluded that UPW's statutory claims could be raised directly in the circuit court, but that the matter should be referred to the HLRB under the doctrine of primary jurisdiction. *UPW*, mem. op. at 4. Therefore, the ICA concluded that the circuit court had erred in dismissing the action because a stay, rather than dismissal without prejudice, was appropriate under the circumstances.

---

21. In *HSTA*, the teachers union brought an action alleging that the governor's furlough plan violated state constitutional rights. This court held that the dispute concerning whether the state constitutional provision granting public employees the right to unionize permitted the Governor to unilaterally impose furloughs, was within the exclusive jurisdiction of the HLRB.

22. The Honorable Patrick W. Border presided.

23. The circuit court did not comment on whether its decision was based on the primary jurisdiction doctrine or exhaustion of administrative remedies.

The ICA concluded that UPW's First Circuit Complaint alleged conduct that was specifically defined as prohibited practices under HRS § 89–13. *UPW*, mem. op. at 8. The ICA concluded that UPW's layoff and privatization claims were based on allegations that Defendants had engaged in the prohibited practices of: (1) discriminating against UPW by laying off employees in retaliation for engaging in protected union activities and filing the Furlough Lawsuit; (2) discriminating against UPW members by failing to take corrective action to terminate current private contractors while implementing the layoff of UPW members; and (3) refusing to bargain collectively regarding the layoff procedures and the privatization. *Id.* The ICA thus reasoned that UPW's layoff and privatization claims were essentially prohibited practice claims. *Id.*

The ICA reasoned that this court's decisions in *HGEA* and *HSTA* reflect a concern that, "when a plaintiff presents to the circuit court a controversy that is identical to one which could have and should have been presented to the HLRB, the circuit court's exercise of jurisdiction necessarily involves a risk of interfering with the HLRB's exclusive jurisdiction over prohibited practice controversies." *Id.*

The ICA concluded, "UPW correctly asserts that its statutory claims could be raised directly in the circuit court." The ICA cited *Konno* for this assertion, indicating that it was referring to the civil service claims under HRS Chapter 76. *Id.* The ICA held that the doctrine of primary jurisdiction applies when a court and an agency have concurrent original jurisdiction to decide issues which have been placed within the special competence of an administrative agency; therefore, the doctrine of primary jurisdiction applied to UPW's "statutory claims." *UPW*, mem. op. at 9. The ICA concluded that under the doctrine of primary jurisdiction, however, dismissal is only appropriate if the parties would not be unfairly disadvantaged. *Id.* Because the statute of limitations could prevent UPW from refiling its claims at the conclusion of the HLRB proceedings, the ICA concluded that the proper remedy was to stay the case pending the outcome of the administrative process. *Id.*

## III.  Standard of Review

■■■ The existence of jurisdiction is a question of law that we review de novo under the right/wrong standard. *HGEA*, 124 Hawai'i at 202, 239 P.3d at 6. Accordingly, a court's decision to invoke the primary jurisdiction doctrine is reviewed de novo as well. *Pac. Lightnet, Inc. v. Time Warner Telecom, Inc.*, 131 Hawai'i 257, 275, 318 P.3d 97, 115 (2013). "If the court determines that the primary jurisdiction doctrine applies, the court, in its discretion, may determine whether to stay the litigation or dismiss without prejudice." *Id.*

## IV.  Discussion

### A.  The Primary Jurisdiction Doctrine

UPW asserts in its Application that HLRB's exclusive original jurisdiction is limited to prohibited practices related to collective bargaining: "*HGEA v. Lingle* and *HSTA v. Abercrombie* decisions were narrow rulings that related only to the constitutional right to collective bargaining, which is implemented by HRS Chapter 89." UPW argues that the decisions "did not set out a broad rule that any claim that involves facts that could also make out a 'prohibited practice' must be presented to the HLRB even if the plaintiff is not alleging a prohibited practice but a violation of other statutory or constitutional provisions."

We agree with UPW to the extent that it argues that *HGEA* and *HSTA* were narrow rulings relating only to claims alleging violations of the rights to collective bargaining. In *HGEA*, the plaintiffs based their request for relief on HRS Chapter 89 and the constitutional right to collective bargaining under article XIII, section 2 of the Hawai'i Constitution. 124 Hawai'i at 200, 239 P.3d at 4. We concluded that although the plaintiffs' complaint did not expressly use the words "prohibited practice," a prohibited practice could be logically inferred because the plaintiffs' complaint essentially alleged that in instituting a unilateral statewide furlough plan, Defendant Lingle had committed a prohibited

practice when she refused to bargain collectively in good faith as required by HRS Chapter 89. Accordingly, we held that the HLRB had exclusive jurisdiction over the plaintiffs' claims pursuant to HRS § 89–14.

Unlike the plaintiffs in *HGEA*, the plaintiffs in *HSTA* deleted all references to HRS Chapter 89 in their complaint and based their request for relief solely on the constitutional right to collective bargaining under article XIII, section 2 of the Hawai'i constitution. *HSTA*, 126 Hawai'i at 322, 271 P.3d at 617. Nonetheless, we reiterated our holding in *HGEA* and emphasized that the legislative purpose of having the administrative agency with expertise in these matters decide them in the first instance is "frustrated if the HLRB's jurisdiction can be defeated by characterizing issues that fall within the scope of HRS Chapter 89 as constitutional claims and then addressing them directly to the circuit court." *HSTA*, 126 Hawai'i at 322, 271 P.3d at 617 (citing *HGEA*, 124 Hawai'i at 208, 239 P.3d at 12).

In the instant case, however, UPW's claims are based on the HWPA and the Free Speech Clause, both of which are within the original jurisdiction of the circuit court and do not facially involve violations of the constitutional or statutory rights to collective bargaining. Thus, *HGEA* and *HSTA* do not control the narrow question presented in the instant application, which essentially requires that we determine whether the primary jurisdiction doctrine applies to UPW's claims.

### 1. History of the Primary Jurisdiction Doctrine

The primary jurisdiction doctrine originated from the United States Supreme Court's decision in *Texas & Pacific Railway Co. v. Abilene Cotton Oil Co.* ("*Abilene*"), 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907). In *Abilene*, a shipper sued a carrier in state court claiming that a carrier's interstate freight rate was "unjust and unreasonable." 204 U.S. at 433, 27 S.Ct. 350. The United States Supreme Court considered whether, consistent with the Interstate Commerce Act, the court had power "to grant relief upon the finding that the rate charged for an interstate shipment was unreasonable, al-

though such rate was the one fixed by the duly published and filed rate sheet, and when the rate had not been found to be unreasonable by the Interstate Commerce Commission." *Abilene*, 204 U.S. at 432, 27 S.Ct. 350.

The Court opined that if the power to originally hear complaints on the subject existed in both courts and the Commission, there might be a divergence between the action of the Commission and the decision of a court. 204 U.S. at 441, 27 S.Ct. 350. The Court stated, "the established schedule might be found reasonable by the Commission in the first instance and unreasonable by a court acting originally, and thus, a conflict would arise which would render the enforcement of the act impossible." 204 U.S. at 441, 27 S.Ct. 350. Accordingly, the Court held, "a shipper seeking reparation predicated upon the unreasonableness of the established rate must, under the act to regulate commerce, primarily invoke redress through the Interstate Commerce Commission, which body alone is vested with power originally to entertain proceedings for the alteration of an established schedule[.]" 204 U.S. at 448, 27 S.Ct. 350 (emphasis added).

In *United States v. Western Pacific Railroad Company* ("*Western Pac. R.R.*"), 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956), the United States Supreme Court further refined the doctrine of primary jurisdiction. Presented with the question of whether the Court of Claims had correctly allocated the issues in a suit between the jurisdiction of the Interstate Commerce Commission and that of the court, i.e., whether the court properly applied the primary jurisdiction doctrine, the Court explained that the primary jurisdiction doctrine was concerned with promoting proper relationships between courts and administrative agencies charged with particular regulatory duties. 352 U.S. at 63–64, 77 S.Ct. 161. The Court held that unlike the exhaustion principle, which applies when a claim is cognizable in the first instance by an administrative agency alone, primary jurisdiction:

applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under

a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

*Western Pac. R.R.*, 352 U.S. at 63–64, 77 S.Ct. 161 (citing *General Am. Tank Car Corp. v. El Dorado Terminal Co.*, 308 U.S. 422, 433, 60 S.Ct. 325, 84 L.Ed. 361 (1940) (holding that the District Court had jurisdiction over the action in assumpsit; however, in light of the provisions of the Interstate Commerce Act, "it should not have proceeded to adjudicate the rights and liabilities of the parties" in the absence of a decision by the Interstate Commerce Commission with respect to the validity of the practice involved)).

Thus, the doctrine of primary jurisdiction arose from a concern that an established rate schedule could be found reasonable by the agency tasked with this determination, but unreasonable by a court, thereby triggering a conflict that could render the enforcement of the Interstate Commerce Act impossible. *Abilene*, 204 U.S. at 441, 27 S.Ct. 350. The doctrine was later refined to include the principle that in cases raising issues of fact not within the conventional experience of judges or requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. *Western Pac. R.R.*, 352 U.S. at 77, 77 S.Ct. 161; *Far East Conference v. United States*, 342 U.S. 570, 574, 72 S.Ct. 492, 96 L.Ed. 576 (1952) (holding that the Federal Maritime Board's primary jurisdiction over matters concerning the Shipping

Act of 1916 precluded the District Court for New Jersey from passing on the merits of the lawsuit, which was brought under the Sherman Anti–Trust Act).

## 2.  Primary Jurisdiction in Hawai'i

This court adopted the doctrine of primary jurisdiction directly from *Western Pac. R.R.*, holding that primary jurisdiction applied "where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Kona Old Hawaiian Trails Group v. Lyman*, 69 Haw. 81, 93, 734 P.2d 161, 168 (1987) (citing *Western Pac. R.R.*, 352 U.S. at 63–64, 77 S.Ct. 161). We concluded, "[w]hen this happens, the judicial process is suspended pending referral of such issues to the administrative body for its views." *Id.* (citing *Western Pac. R.R.*, 352 U.S. at 64, 77 S.Ct. 161). We opined, "[i]n effect, the courts are divested of whatever original jurisdiction they would otherwise possess. And 'even a seemingly contrary statutory provision will yield to the overriding policy promoted by the doctrine.'" 69 Haw. at 93, 734 P.2d at 168–69 (citing B. Schwartz, Administrative Law § 8.24, at 488 (2nd ed. 1984) (emphasis omitted)).

In *Kona Old*, the plaintiffs' invoked the circuit court's jurisdiction pursuant to HRS §§ 91–14(a),[24] 205A–6,[25] and 603–21,[26] seeking a ruling that the director had violated the Coastal Zone Management Act ("CZMA") in issuing a special management area ("SMA") minor use permit, and an order voiding the

---

**24.**  HRS § 91–14(a) (1985) stated:

Any person aggrieved by a final decision and order in a contested case or by a preliminary ruling of the nature that deferral of review pending entry of a subsequent final decision would deprive appellant of adequate relief is entitled to judicial review thereof under this chapter; but nothing in this section shall be deemed to prevent resort to other means of review, redress, relief, or trial de novo, including the right of trial by jury, provided by law.

**25.**  HRS § 205A–6 (1985) read in pertinent part:

(a) Subject to chapters 661 and 662, any person or agency may commence a civil action alleging that any agency:

(1) Is not in compliance with one or more of the objectives, policies, and guidelines provided or authorized by this chapter within the special management area and the waters from the shoreline to the seaward limit of the State's jurisdiction; or
(2) Has failed to perform any act or duty required to be performed under this chapter; or
(3) In exercising any duty required to be performed under this chapter, has not complied with the provisions of this chapter.

*Kona Old*, 69 Haw. at 86, 734 P.2d at 165.

**26.**  "HRS § 603–21 formerly defined the jurisdiction of circuit courts." *Kona Old*, 69 Haw. at 89, 734 P.2d at 166.

permit and enjoining an authorized construction of real property situated within the special management area of Kailua-Kona. 69 Haw. at 89, 734 P.2d at 166. We concluded that the issuance of a SMA minor permit and its enforcement required the resolution of issues which, under CZMA's regulatory scheme, had been placed within the special competence of the county planning department. *Id.* at 93, 734 P.2d at 169. We held, "the request for judicial intervention in the administrative process should not have preceded the resolution by the Board of Appeals of the question of whether the planning director's action in issuing the minor permit was proper." *Id.* Accordingly, this court applied the doctrine of primary jurisdiction and affirmed the circuit court's dismissal of the case. *Id.*

We have similarly applied the doctrine of primary jurisdiction to claims originally cognizable in the circuit court but containing issues that first require a determination by an administrative agency. *See Chun v. Emps. Ret. Sys. of State of Haw.,* 73 Haw. 9, 13, 828 P.2d 260, 262 (1992) (holding that the considerations of uniformity and consistency in a specialized agency's administration of the Employees' Retirement System, mandated suspension of the judicial process pending an initial review of the issues by the administrative body). *See also Jou v. Nat'l Interstate Ins. Co. of Haw.,* 114 Hawai'i 122, 128, 157 P.3d 561, 567 (App.2007) (applying the primary jurisdiction doctrine and referring the question of whether a workers' compensation carrier acted unreasonably or in bad faith to the Director of the Department of Labor and Industrial Relations before proceeding with a bad faith tort claim in circuit court). *But see Aged Hawaiians v. Hawaiian Homes Comm'n,* 78 Hawai'i 192, 202, 891 P.2d 279, 289 (1995) (holding that the doctrine did not apply where (1) a pure question of law is at issue and technical matters calling for the special competence of the admin-

istrative expert are not involved; and (2) cases in which the constitutionality of the agency's rules and procedures is challenged and questions are raised as to whether the agency has acted within the scope of its authority).

Notwithstanding, "[n]o fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." *Western Pac. R.R.,* 352 U.S. 59, 64, 77 S.Ct. 161.

## B. UPW's Retaliation Claims

### 1. Framework for the Application of the Primary Jurisdiction Doctrine

As discussed above, this court adopted the doctrine of primary jurisdiction directly from the United States Supreme Court's opinion in *Western Pac. R.R.,* 352 U.S. 59, 77 S.Ct. 161. The plaintiffs in *Western Pac. R.R.* had brought suit in the Court of Claims under the Tucker Act [27] to recover money from the United States. 352 U.S. at 60 n. 1, 77 S.Ct. 161. The United States Supreme Court was specifically presented with the question of whether the Court of Claims had properly applied the doctrine of primary jurisdiction; that is, whether it had correctly allocated the issues in the suit between the jurisdictions of the Interstate Commerce Commission and that of the court. 352 U.S. at 64, 77 S.Ct. 161. We are similarly presented in the instant case with the question of whether the ICA properly applied the doctrine of primary jurisdiction to UPW's claims, even when the circuit court had original jurisdiction over those claims. Accordingly, the Court's reasoning in its application of the doctrine is particularly instructive to the instant case.

In *Western Pac. R.R.,* the Court explained that the determination of whether a lower

---

**27.** The Tucker Act governed the adjudication of money claims against the United States. Gregory C. Sisk, The Tapestry Unravels: Statutory Waivers of Sovereign Immunity and Money Claims Against the United States, 71 Geo. Wash. L. Rev. 602, 608 (2003). It conferred the Court of Claims jurisdiction over money claims (other than in tort) based upon federal statutes, execu-

tive regulations, and contract, and also expanded that court's authority to hear suits based upon the Constitution. *Id.* "Moreover, the Tucker Act granted the then-circuit courts (today the District Courts) concurrent jurisdiction with the Court of Claims over monetary claims not exceeding $10,000 in amount." *Id.*

court had properly applied the doctrine of primary jurisdiction required an examination of whether the Act conferring jurisdiction upon the Interstate Commerce Commission, the Interstate Commerce Act, required the agency to first pass on the issue in dispute, which in turn depended on whether the controversy in dispute raised "issues of transportation policy which ought to be considered by the Commission in the interests of a uniform and expert administration of the regulatory scheme laid down by that Act." 352 U.S. at 65, 77 S.Ct. 161. Based on these factors, the Court held that the issues presented in the claim were initially matters for the Commission's determination, even if the suits had been brought under the Tucker Act, and not the Interstate Commerce Act. *Id.* at 70, 77 S.Ct. 161.

UPW's retaliation claims are unquestionably cognizable in the circuit court. UPW alleges, however, that Defendant Lingle retaliated against UPW members for filing the Furlough Lawsuit. The Furlough Lawsuit was an assertion of the Employees' right to collective bargaining, alleging that Defendant Lingle violated collective bargaining laws by unilaterally imposing statewide furloughs. Although UPW's retaliation claims do not specifically assert the right to collective bargaining, prohibited practice claims under HRS § 89–13 nevertheless appear to be implicated by virtue of UPW's allegation that Defendants implemented the layoffs in retaliation for the Furlough Lawsuit.

An examination of the law governing the HLRB's jurisdiction under HRS Chapter 89, therefore, is necessary to determine whether the doctrine of primary jurisdiction applies. Specifically, HRS Chapter 89 must be examined to determine whether it requires the HLRB to first pass on the controversy, which in turn depends on whether the controversy raises policy issues concerning matters that ought to be considered by the HLRB in the interests of a uniform and expert administration of the regulatory scheme laid down by HRS Chapter 89.

### a. The Regulatory Scheme of HRS Chapter 89, Collective Bargaining in Public Employment

HRS Chapter 89 is titled "Collective Bargaining in Public Employment." HRS § 89–1(a) outlines the following legislative findings:

> [J]oint decision-making is the modern way of administering government. Where public employees have been granted the right to share in the decision-making process affecting wages and working conditions, they have become more responsive and better able to exchange ideas and information on operations with their administrators. Accordingly, government is made more effective. The legislature further finds that the enactment of positive legislation establishing guidelines for public employment relations is the best way to harness and direct the energies of public employees eager to have a voice in determining their conditions of work; to provide a rational method for dealing with disputes and work stoppages; and to maintain a favorable political and social environment.

HRS § 89–1(a). HRS § 89–1(b) states in part, "it is the public policy of the State to promote harmonious and cooperative relations between government and its employees and to protect the public by assuring effective and orderly operations of government." HRS § 89–1(b). HRS § 89–1(b) also notes that this policy is best effectuated by:

> (1) Recognizing the right of public employees to organize for the purpose of collective bargaining; (2) Requiring public employers to negotiate with and enter into written agreements with exclusive representatives on matters of wages, hours, and other conditions of employment, while, at the same time, maintaining the merit principle pursuant to section 76–1; and (3) Creating a labor relations board to administer the provisions of chapters 89 and 377.

The Committee on Human Resources explained that the legislature had created the HLRB, formerly the Hawai'i Public Employment Relations Board, "to administer the provisions of Chapter 89 in an effort to promote cooperative relations between the government and its employees and to protect the public by ensuring orderly government operations." *HGEA*, 124 Hawai'i at 204, 239 P.3d

at 8 (citing S. Stand. Comm. Rep. No. 597–82, in 1982 Senate Journal, at 1202). Thus, the policy motivating Chapter 89 was the promotion of cooperative relations between government and its employees, and the HLRB was specifically created to administer this policy.

The retaliation claims in the instant case clearly involve relations between the government and its public sector employees. The crux of UPW's allegation is that, because it exercised its right to collective bargaining by filing a lawsuit opposing unilateral statewide furloughs, Defendants retaliated against UPW members by laying off these members. If UPW's allegations are true, Defendants have violated the employees' right to collectively bargain by retaliating against them for asserting such rights by filing the Furlough Lawsuit. HRS Chapter 89 specifically protects the rights of public employees to exercise collective bargaining. Pursuant to HRS § 89–1, the HLRB was created to administer the provisions of Chapter 89.

In addition, HRS § 89–14 specifically supports the conclusion that UPW's retaliation claims raise issues of public employment policy that ought to be considered by the HLRB. As we explained in *HGEA*, HRS § 89–14 was amended in 1982 in response to the ICA opinion in *Winslow v. State*, 2 Haw.App. 50, 625 P.2d 1046 (1981), which conferred concurrent jurisdiction to the HLRB and circuit court over public employee prohibited practice complaints. 124 Hawai'i at 203, 239 P.3d at 7. The legislature explained that the purpose of the bill was to make the jurisdiction of the HLRB exclusive in controversies relating to prohibited practices. S. Stand. Comm. Rep. No. 597–82, in 1982 Senate Journal, at 1202. In a Report issued by the Committee on Public Employment and Government Operations, the committee explained that the phrase, "exclusive original jurisdiction" may also be referred to as "exclusive primary or initial jurisdiction." H. Stand. Comm. Rep. No. 134–87, in 1982 House Journal, at 944. The committee explained that under the bill as amended:

> [A] person with a prohibited practice complaint must first file with the HLRB which would then conduct proceedings on the complaint and issue a decision or order. The complainant would not have the option of either filing the prohibited practice complaint with HLRB or in the circuit court or of filing the same complaint concurrently with both the HRLB and the court.

*Id.* In the report issued by the Committee on Human Resources, the committee stated that it believed that the original intent of HRS § 89–14 was to allow the HLRB to have primary jurisdiction of prohibited practice complaints because the HLRB was "the administrative agency with the <u>expertise in public employment relations</u>."[28] S. Stand. Comm. Rep. N. 597–82, in 1982 House Journal, at 1202 (emphasis added).

Accordingly, as amended, HRS § 89–14 provides: "Any controversy concerning prohibited practices may be submitted to the board in the same manner and with the same effect as provided in section 377–9; provided that the board shall have exclusive original jurisdiction over such a controversy[.]" Thus, HRS § 89–14 expressly requires that the HLRB first pass on prohibited practice controversies.

UPW alleges that Defendants violated the HWPA by retaliating against UPW and its members for filing and pursuing the Furlough Lawsuit in circuit court. Pursuant to HRS § 89–13(a)(4), it is a prohibited practice to: "Discharge or otherwise discriminate against an employee because the employee has signed or filed an affidavit, petition, or complaint or given any information or testimony under this chapter, or because the employee has informed, joined, or chosen to be represented by any employee organization." Viewing UPW's allegations in light of HRS § 89–13(a)(4), UPW essentially presents a prohibited practice controversy.

Thus, UPW's retaliation claims raise issues of public employment policy that ought to be considered by the HLRB in the interest of a

---

**28.** We recognize that the legislature's use of the term "primary" in connection with the term "jurisdiction" is not synonymous with the primary jurisdiction doctrine. The legislature's use of the term was clearly intended to confer the HLRB with "exclusive original jurisdiction" over prohibited practice complaints.

uniform and expert administration of the regulatory scheme laid down by HRS Chapter 89. Moreover, the legislature explicitly conferred exclusive or "initial jurisdiction" to the HLRB over prohibited practices, such as discharging employees for filing complaints, because it recognized that the HLRB possessed expertise in matters concerning public employment. Therefore, HRS Chapter 89 requires the HLRB to first pass on UPW's retaliation claim, thus triggering the primary jurisdiction doctrine.

### b. The ICA Properly Applied the Primary Jurisdiction Doctrine to UPW's Retaliation Claims

The circuit court has original jurisdiction over UPW's HWPA and Free Speech retaliation claims, and therefore, UPW has a right to pursue claims under these laws. Based on the reasons above, however, we hold that the primary jurisdiction doctrine is applicable to UPW's retaliation claims. Thus, pursuant to *Kona Old,* UPW's right to have these claims considered by the courts yields to the overriding policy promoted by the doctrine of primary jurisdiction. 69 Haw. at 93, 734 P.2d at 168 (citing B. Schwartz, Administrative Law § 8.24, at 488 (2nd ed. 1984)).

The mere fact that the issues were phrased in UPW's complaint as HWPA and free speech claims are not determinative on this issue. *See Western Pac. R.R.,* 352 U.S. at 68–69, 77 S.Ct. 161 ("[T]he mere fact that the issue is phrased in one instance as a matter of tariff construction and in the other as a matter of reasonableness should not be determinative on the jurisdictional issue."). As the United States Supreme Court stated, such would make the doctrine of primary jurisdiction an "abstraction to be called into operation at the whim of the pleader." 352 U.S. at 59, 77 S.Ct. 161.

The United States Supreme Court expressly rejected such an approach in *General American Tank,* when it held that, while the action was an ordinary one in assumpsit on a written contract, "[w]hen it appeared in the course of the litigation that an administrative problem, committed to the Commission, was involved, the court should have stayed its

hand pending the Commission's determination[.]" 308 U.S. at 433, 60 S.Ct. 325. The Court concluded that the policy of the Act was that reasonable allowances and practices were to be fixed and settled after full investigation by the Commission. *Id.* at 432–33, 60 S.Ct. 325. Thus, the Court held that although the District Court had jurisdiction of the subject matter and of the parties, the issues before the District Court, the reasonableness and legality of the practices of the parties, raised questions that were subjected by the Interstate Commerce Act to the administrative authority of the Interstate Commerce Commission. *Id.*

The dissent argues that it is well-established that the agency and the court must have concurrent jurisdiction over a claim in order for the primary jurisdiction doctrine to apply. Dissenting Opinion at 211, 325 P.3d at 623 (citing *Aged Hawaiians,* 78 Hawai'i at 202, 891 P.2d at 289). Respectfully, we disagree. The primary jurisdiction doctrine does not presume that a claim must be originally cognizable by both the court and the agency. The agency and the court need not have concurrent jurisdiction over the claims, as long as the agency and the court have concurrent jurisdiction over issues presented in the claims. In *Aged Hawaiians* and in *Kona Old,* we held that the doctrine of primary jurisdiction applies "where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of <u>issues</u> which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Aged Hawaiians,* 78 Hawai'i at 202, 891 P.2d at 289; *Kona Old,* 69 Haw. at 93, 734 P.2d at 168–69 (emphasis added). Accordingly, we recognized that the emphasis in the application of the doctrine of primary jurisdiction was on the <u>issues</u> raised by the claim, rather than the claim itself.

The retaliation allegations in UPW's complaint provide a basis for both a prohibited practice claim and claims under the HWPA and Free Speech Clause; however, one issue is determinative of all these claims, namely, whether Defendants' decision to lay off government employees was motivated by the

Furlough Lawsuit. Thus, the question of whether Defendants violated the HWPA and Free Speech Clause are inextricably intertwined with the question of whether Defendants engaged in a HRS § 89–13(a)(4) prohibited practice. Under these circumstances, we conclude that the HLRB must be the first to pass on the motivations for Defendants' decision to implement the layoffs. *Cf. In re United Pub. Workers,* 131 Hawai'i 142, 315 P.3d 768, 777 (App.2013) ("The HLRB's jurisdiction clearly extends to determining whether, in a particular instance, specified employer conduct constitutes a 'prohibited practice' under HRS § 89–13.").

This is consistent with the reasons for the existence of the primary jurisdiction doctrine, avoiding the risk of divergent decisions between an administrative agency and a court on certain administrative questions. Moreover, it is consistent with the purposes the primary jurisdiction doctrine serves, that of (1) uniformity which would obtain if a specialized agency initially passed on certain types of administrative questions, and (2) deference to the expert and specialized knowledge of administrative agencies specifically created by the legislature for regulating certain subject matter. Thus, as stated in *Western Pac. R.R.,* 352 U.S. at 64–65, 77 S.Ct. 161:

> Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.

(Citing *Far East Conference,* 342 U.S. at 574–75, 72 S.Ct. 492).

The regulatory scheme laid down by HRS Chapter 89 specifically contemplates that issues concerning governmental and employee relations ought to be considered by the HLRB in the interest of uniform and expert administration. Moreover, HRS § 89–14 expressly requires that the HLRB first pass on the issues presented in UPW's complaint be-cause UPW's allegations raise a prohibited practice controversy.

Accordingly, we hold that the ICA properly applied the doctrine of primary jurisdiction to UPW's retaliation claims.

### 2. A Stay Is Appropriate Under the Circumstances

█ Under the doctrine of primary jurisdiction, a court has discretion either to retain jurisdiction or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice. *Reiter v. Cooper,* 507 U.S. 258, 268–69, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993).

In *Reiter,* the United States Supreme Court rejected the defendant's argument that the primary jurisdiction doctrine required plaintiffs to initially present their claims to the administrative agency, rather than the court. 507 U.S. at 268, 113 S.Ct. 1213. On the contrary, the Court held that the doctrine was specifically applicable to "claims properly cognizable in court that contain some issue within the special competence of an administrative agency. It requires the court to enable a 'referral' to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling." *Id.* The Court further held that "[r]eferral of the issue to the administrative agency does not deprive the court of jurisdiction; it has discretion either to retain jurisdiction or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice." *Id.* at 268–69, 113 S.Ct. 1213.

The dissent states that our conclusion that UPW's retaliation claims concerns prohibited practices conflicts with our conclusion that the court may decide whether to stay or dismiss the action because HRS § 89–14 expressly provides that the HLRB has "exclusive original jurisdiction" over prohibited practices. *See* Dissenting Opinion at 216, 325 P.3d at 628. As discussed *supra,* application of the primary jurisdiction was necessary because UPW's claims were brought under the HWPA and the Hawai'i Constitution over which the circuit court has jurisdiction. Subsumed within these claims, howev-

er, were prohibited practice controversies; therefore, under HRS Chapter 89's regulatory scheme, the HLRB was required to make an initial determination before the circuit court could adjudicate claims over which it has jurisdiction.

█ In the instant case, the ICA concluded that UPW's First Circuit Complaint alleged that Defendants had essentially engaged in prohibited practices by implementing the layoffs and privatization, but that UPW's statutory claims could be raised directly in the circuit court. The ICA held, therefore, that pursuant to the primary jurisdiction doctrine, a stay rather than a dismissal of UPW's claims was appropriate because the statute of limitations could prevent UPW from refiling its claims at the conclusion of the HLRB's proceedings. As to UPW's retaliation claims, we agree.

Therefore, we affirm the ICA's judgment staying UPW's retaliation claims pending the outcome of the administrative process.

## C. UPW's Privatization Claims

UPW alleged in its First Circuit Complaint that Defendants privatized public work in violation of civil service merit principles protected by article XVI, section 1 of the Hawai'i Constitution and Hawaii's civil service laws, HRS Chapters 76 and 77,[29] "by contracting out civil service work—for example, work at the Kulani Correctional Facility—to private companies at the same time that public employees who were available to perform that work were being subjected to layoffs." UPW asserts in its Application that in Konno, 85 Hawai'i 61, 937 P.2d 397, this court "expressed no doubt that these claims were properly cognizable in an original suit before the circuit court." UPW argues, therefore, that the ICA erred in concluding that UPW's privatization claims, which UPW asserts are identical to the claim brought in Konno, contained issues within the specialized expertise of the HLRB.

**29.** HRS Chapter 77 was repealed in its entirety in 2000 by Act 253.

**30.** HRS § 76–77 states in relevant part: "The civil service to which this part applies comprises all positions in the public service of each county,

## 1. Hawaii's Civil Service Laws

In Konno, the central issue was the privatization of public services, namely the validity of a contract entered into by the County of Hawai'i to privatize the operation of a landfill. 85 Hawai'i 61, 64, 937 P.2d 397, 400. We held that the County violated civil service laws and merit principles but had not violated collective bargaining laws. Id.

We explained in Konno that article XVI, section 1 of the Hawai'i Constitution provides, "[t]he employment of persons in the civil service, as defined by law, of or under the State, shall be governed by the merit principle." We concluded that by its express terms, article XVI, section 1 simply means that "civil service," however defined, was to be governed by merit principles. 85 Hawai'i 61, 70, 937 P.2d 397, 406. We stated, however, that article XVI, section 1 of the Hawai'i Constitution did not define the precise scope of the civil service, i.e., the particular job positions that are within civil service. We explained: "Instead, article XVI, section 1 expressly refers to other sources for a definition of 'civil service.' It states: 'civil service, as defined by law ....'" Id. (emphasis in original) (ellipsis in original).

We held that in order to determine the scope of the term "civil service," statutory and case law had to be examined; therefore, the constitution did not establish an independently enforceable right to the protection of merit principles. We concluded, however, that civil service positions were also subject to the civil service statutes contained within HRS Chapters 76 and 77. 85 Hawai'i 61, 70, 937 P.2d 397, 406 (1997). Thus, we concluded that HRS Chapters 76 and 77 provided civil servants with an enforceable right to the protection of merit principles guaranteed by article XVI, section 1 of the Hawai'i constitution.

We then concluded that under HRS § 76–77,[30] landfill worker positions were within the civil service under the "nature of the services now existing or hereafter established, and embraces all personal services performed for each county ... [.]" HRS § 76–77 then lists a number of exemptions to these civil service positions.

test."[31]   85 Hawai'i at 74, 937 P.2d at 410. Accordingly, we held that the County violated civil service laws and merit principles, and instructed the circuit court to fashion injunctive relief requiring the landfill to be transferred from private to County operation, and also to monitor the transition and impose sanctions for non-compliance. *Id.* at 79, 937 P.2d at 415. We expressed no doubt that the issues raised in the privatization claims were within the original jurisdiction of the circuit court, and not the HLRB.

At the time *Konno* was decided, HRS § 76–1 (1985) stated that it was the policy of the State that the personnel system be applied and administered in accordance with certain merit principles.[32]   Act 253 of 2000 ("Act 253") repealed numerous sections of HRS Chapter 76 and repealed Chapter 77 in its entirety.   In addition, Act 253 established a Merit Appeals Board ("MAB") and amended the definition of "merit principle" in HRS § 76–1.   HRS § 76–1, as amended, defines the merit principle as "the selection of persons based on their fitness and ability for public employment and the retention of employees based on their demonstrated appropriate conduct and productive performance." HRS § 76–1 (Supp.2000).

Defendants argue that after the enactment of Act 253, UPW and the State have apparently argued over "whether. original jurisdiction over claimed violations of HRS § 76–16(b),[33] as it relates to contracting out claims[34] rests with the HLRB pursuant to HRS §§ 89–5 and 89–9(d), or with the various merit appeals boards pursuant to HRS §§ 76–16(a), [35] 76–14(a), (b) and (e),[36] and 76–47."[37]   Accordingly, we address whether UPW's privatization claims require the reso-

---

**31.** According to this approach, "services that have been 'customarily and historically provided by civil servants' cannot be privatized, absent a showing that civil servants cannot provide those services." *Konno*, 85 Hawai'i at 69, 937 P.2d at 405 (citing *Wash. Fed'n of State Emps., AFL–CIO v. Spokane Cmty Coll.*, 90 Wash.2d 698, 585 P.2d 474, 477 (1978) (en banc)).

**32.** HRS § 76–1 (1985), before it was amended, provided the following merit principles:

(1) Equal opportunity for all regardless of race, sex, age, religion, color, ancestry, or politics.  No person shall be discriminated against in any case because of any disability, in examination, appointment, reinstatement, reemployment, promotion, transfer, demotion, or removal, with respect to any position the duties of which, in the opinion of the director of human resources development may be efficiently performed by a person with such a disability; provided that the employment will not be hazardous to the appointee or endanger the health or safety of the appointee's co-workers or others;
(2) Impartial selection of the ablest person for government service by means of competitive tests which are fair, objective, and practical;
(3) Just opportunity for competent employees to be promoted within the service;
(4) Reasonable job security for the competent employee, including the right of appeal from personnel actions;
(5) Systematic classification of all positions through adequate job evaluations;  and
(6) Proper balance in employer-employee relations between the people as the employer and employees as the individual citizens, to achieve a well-trained, productive, and happy working force.

**33.** HRS § 76–16(b) is the State counterpart to HRS § 76–77, the statute governing civil service positions in the county, as interpreted in *Konno*, 85 Hawai'i 61, 937 P.2d 397.  HRS § 76–16(b) states: "The civil service to which this chapter applies shall comprise all positions in the State now existing or hereafter established and embrace all personal services performed for the State ... [.]"  HRS § 76–16(b) then provides a number of exemptions to these civil service positions, none of which apply here.

**34.** Defendants use the term "contracting out" claims interchangeably with "privatization" claims.

**35.** HRS § 76–16(a) states:

(a) The state constitution mandates that the employment of persons in the civil service, as defined by law, be governed by the merit principle.  The legislature declares that the public policy of the State is that all positions in the civil service systems of the respective jurisdictions shall be filled through civil service recruitment procedures based on merit and that the civil service system of the respective jurisdictions shall comprise all positions, whether permanent or temporary, in the jurisdiction now existing or hereafter established and embrace all personal services performed for the jurisdiction, except employees or positions exempted under this section, or sections 46–33 and 76–77.

**36.** HRS § 76–14 provides the duties and the jurisdiction of the MAB.

**37.** HRS § 76–47 provides the appointment, authority, and the procedures of the MAB.

lution of issues placed within the special competence of either the HLRB or the MAB.

### 2. Civil Service Laws Do Not Require Privatization Claims to be Determined by the HLRB

██ HRS § 89–5(a) (2012) states that the HLRB was created to ensure that (1) collective bargaining is conducted in accordance with HRS Chapter 89, and (2) the merit principle under HRS § 76–1 is maintained. However, we concluded in *Konno* that, pursuant to HRS § 89–9(d), "The employer and the exclusive representative shall not agree to any proposal which would be inconsistent with the merit principle[.]" Thus, we held that the County and UPW were barred from bargaining over both the privatization decision and its effects because we concluded that County's privatization effort violated civil service laws and merit principles. 85 Hawai'i at 78, 937 P.2d at 414 ("It would be absurd for us to hold that the County violated collective bargaining laws by refusing to negotiate with the UPW when both parties were expressly barred from negotiating [the County's privatization effort] by statute.").

The HLRB, therefore, only has jurisdiction over issues related to HRS Chapter 89, such as collective bargaining and prohibited practice controversies, to the extent they do not violate merit principles. UPW alleged in its First Circuit Complaint that Defendants unlawfully abolished civil service positions and contracted out positions that have historically and customarily been performed by civil servants under the merit system. These allegations may constitute violations of civil service laws and merit principles. Pursuant to *Konno* and HRS § 89–9(d), UPW and Defendants were expressly barred from bargaining over either the decision to privatize or its effect if privatization violated civil service

laws or merit principles. Thus, the question of whether privatization violated civil service laws and merit principles is a threshold question that must be determined by the circuit court before the HLRB's specialized expertise in addressing prohibited practices is implicated.

Moreover, the purpose of Act 253 was "to reform the public employment laws that were enacted to implement two constitutional mandates—that there be civil service based on merit and that public employees have the right to bargain collectively." 2000 Haw. Sess. L. Act 253, § 1 at 853. Act 253 sought to repeal Hawaii's civil service and collective bargaining laws and to create a new comprehensive public employment law. S. Stand. Comm. Rep. No. 2686, in 2000 Senate Journal, at 1104. The Joint Labor and Environmental and Ways and Means Standing Committee Report states: "Public employment is governed by two often contradictory set of laws—those for civil service and those for collective bargaining. While these laws once clearly delineated the difference between the two, changes over many years have blurred the lines of responsibility and authority." *Id.* The report further states "that one of the keys to successful modernization and a more responsive, adaptive government, is to restore the 'bright line'—the clear delineation between civil service and collective bargaining." *Id.* Thus, the legislative history of Act 253 reflects an intent to distinguish issues related to civil service and merit principles from collective bargaining.

Therefore, we hold that HRS Chapter 89 does not require that the HLRB first pass on controversies related to privatization. The ICA erred in staying UPW's privatization claims to pursue administrative remedies before the HLRB under the primary jurisdiction doctrine.[38]

38. Defendants argue that UPW's privatization claims are within the HLRB's jurisdiction because the claims were bound up with its central claim that Lingle was retaliating against UPW members. Defendants also argue that UPW is alleging that Lingle was privatizing civil service positions in retaliation for the Furlough Lawsuit. In *Konno*, plaintiffs also argued that the privatization of the landfill was to "punish" the plaintiffs for endorsing former Mayor Inouye in the 1992 primary election. 85 Hawai'i at 74 n. 10,

937 P.2d at 410 n. 10. We concluded that the County violated constitutionally mandated merit principles and civil service statutes; therefore, it was unnecessary for us to address this argument. Similarly, in this case, the court may resolve UPW's claim that Defendants' privatization actions violated merit principles and civil service laws without having to make a determination on the issue of retaliation. However, if the court concludes that the privatization is not in violation of merit principles or civil service laws, any

### 3. The Merit Appeals Board's Jurisdiction Over Civil Service Laws

■ Defendants also argue that original jurisdiction over claimed violations of HRS § 76–16 as it relates to "contracting out claims" rests with the HLRB or in the alternative, the various merit appeals boards pursuant HRS §§ 76–14, 76–16, and 76–47. This assertion lacks merit.

HRS § 76–47 requires that each jurisdiction [39] "establish a merit appeals board that shall have exclusive authority to hear and decide appeals relating to matters set forth in section 76–14 concerning the civil service of the jurisdiction." HRS § 76–14 then provides in relevant part:

§ 76–14. Merit appeals board; duties, and jurisdiction

(a) The merit appeals board of each jurisdiction shall decide appeals from any action under this chapter taken by the chief executive, the director, an appointing authority, or a designee acting on behalf of one of these individuals, relating to:

(1) Recruitment and examination;

(2) Classification and reclassification of a particular position, including denial or loss of promotional opportunity or demotion due to reclassification of positions in a reorganization;

(3) Initial pricing of classes; and

(4) Other employment actions under this chapter, including disciplinary actions and adverse actions for failure to meet performance requirements, taken against civil service employees who are excluded from collective bargaining coverage under section 89–6.

(b) Any person suffering legal wrong by an action under subsection (a)(1) or aggrieved by such action shall be entitled to appeal to the merit appeals board. Any employee covered by chapter 76 suffering legal wrong by an action under subsection (a)(2) or (3) shall be entitled to appeal to the merit appeals board. Only employees covered by chapter 76, who are excluded from collective bargaining, suffering legal wrong by an action under subsection (a)(4) shall be entitled to appeal to the merit appeals board. Appeals under this section shall be filed within time limits and in the manner provided by rules of the merit appeals board.

Although "any person" can appeal HRS § 76–14(a)(1) "recruitment and examination" issues to a MAB under HRS § 76–14(b)(1), only "employees" can bring appeals under subsections (a)(2) to (a)(4), and UPW is not an employee. In any event, privatization issues do not relate to "recruitment and examination."

In addition, privatization does not relate to "classification and reclassification of a particular position, including denial or loss of promotional opportunity or demotion due to reclassification of positions in a reorganization," or "initial pricing of classes" under HRS §§ 76–14(a)(2) and (a)(3). Even if privatization could, under HRS § 76–14(a)(4), be characterized as "other employment actions under this chapter, including disciplinary actions and adverse actions for failure to meet performance requirements, taken against civil service employees who are excluded from collective bargaining coverage under section 89–6," this is an issue we need not and do not address. This is because UPW would not be able to bring privatization claims under HRS §§ 76–16, 76–14, or 76–47 to a merit appeals board because under HRS § 76–14(b), claims under HRS § 76–14(a)(4) can only be brought by "employees covered by chapter 76, who are excluded from collective bargaining." (Emphasis added). HRS § 76–11 provides that an " 'Employee' or 'public employee' means any person holding a position in the service of a jurisdiction, irrespective of status or type of appointment; provided that, if the context clearly applies only to an employee who is a member of the civil service, 'em-

retaliation allegations would appear to implicate the HLRB's specialized expertise in addressing prohibited practices.

**39.** "Jurisdiction" is defined by HRS § 76–11 to mean "the State, the city and county of Honolu-

lu, the county of Hawaii, the county of Maui, the county of Kauai, the judiciary, the department of education, the University of Hawaii, and the Hawaii health systems corporation."

ployee' means a civil service employee." To repeat, UPW is not an "employee."

Finally, HRS § 76–16 requires all positions in the civil service systems be filled through civil service recruitment procedure based on merit principles, and includes public employees within civil service unless specifically excluded or exempted; however, it contains no reference to the merit appeals boards. Having determined that UPW's privatization claims are not subject to HRS § 76–14, Defendants' alternate argument that the primary jurisdiction doctrine requires referral of UPW's privatization claims to Chapter 76 merit appeals board is devoid of merit.

## IV. Conclusion

We hold that the primary jurisdiction doctrine was applicable to UPW's retaliation claims because the claims required the resolution of issues that have been placed within the special competence of the HLRB under HRS Chapter 89's regulatory scheme. In addition, we hold that a stay, rather than a dismissal, was appropriate under the circumstances.

We also hold that the primary jurisdiction doctrine was not applicable to UPW's privatization claims because they did not contain any issues which, under Hawaii's collective bargaining and civil service laws, had been placed within the specialized competence of either the HLRB or the MAB. Therefore, the circuit court erred in dismissing UPW's privatization claims, and the ICA erred in referring the claims to the HLRB.

Accordingly, we affirm the ICA's judgment on appeal to the extent that it vacated the circuit court's order dismissing UPW's complaint, and agree with the ICA's remand instructions to the extent that it ordered the circuit court to stay UPW's retaliation claims pursuant to the primary jurisdiction doctrine. We disagree, however, that the primary ju-

risdiction doctrine applies to UPW's privatization claims, and therefore, instruct the circuit court to proceed with the privatization claims consistent with this opinion.

UNITED PUBLIC WORKERS, AFSCME, LOCAL 646, AFL–CIO, Petitioner/Plaintiff–Appellant,

vs.

NEIL ABERCROMBIE,[1] Governor, State of Hawai'i; Kalbert K. Young, Director, Department of Budget and Finance, State of Hawai'i; Barbara A. Krieg, Director, Department of Human Resources Development, State of Hawai'i; Ted Sakai, Director, Department of Public Safety, State of Hawai'i,[2] Respondents/Defendants–Appellees.

Concurring and Dissenting Opinion by ACOBA, J., In Which POLLACK, J., Joins.

In my view, respectfully, (1) the majority's formulation and application of the doctrine of primary jurisdiction is incorrect in view of Hawai'i Revised Statutes (HRS) § 89–14 (1993) and precedent, (2) jurisdiction on the constitutional claims rests with the circuit court, (3) jurisdiction of the Hawai'i Whistleblower's Protection Act (HWPA), HRS Chapter 378, lies with the circuit court, and (4) collateral estoppel would apply to limit litigation and avoid conflicts where jurisdiction may be asserted on the underlying conduct of a claim filed in both the circuit court and with an agency.

### I.

### A.

On August 27, 2009, Petitioner/Plaintiff–Appellant the United Public Workers, AFSCME, Local 646, AFL–CIO (UPW) filed

---

1. During the pendency of this appeal, Neil Abercrombie, Governor of the State of Hawai'i, succeeded Linda Lingle. Thus, pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 43(c), Abercrombie has been substituted automatically for Lingle in this case.

2. Kalbert K. Young, Director, Department of Budget and Finance, State of Hawai'i; Barbara A. Krieg, Director, Department of Human Re-

sources Development, State of Hawai'i; and Ted Sakai, Director, Department of Public Safety, State of Hawai'i have been substituted as parties to this appeal pursuant to HRAP Rule 43(c). UPW also listed Linda Lingle's Chief Policy Advisor, Linda Smith, as a Defendant. This title does not exist in Governor Abercrombie's current cabinet.

a "First Amended Prohibited Practice Complaint" with the Hawai'i Labor Relations Board (HLRB) (HLRB Complaint) alleging a number of violations of HRS § 89–13(a) (Supp.2003). Specifically, UPW stated that then-Governor Linda Lingle (Governor Lingle), Marie Laderta, Director of the Department of Human Resources Development, and Clayton Frank, Director of the Department of Public Safety (collectively, "Defendants") willfully:

    a.  Interfered, restrained, and coerced employees in the exercise of rights guaranteed under chapter 89 in violation of Section 89–13(a)(1) [ [3] ], HRS;

    b.  Discriminated regarding terms and conditions of employment to discourage membership in an employee organization through threats to job security, implementation of reduction in force, layoffs and discharges in violation of Section 89–13(a)(3) [ [4] ], HRS, . . .;

    c.  Refused to bargain collectively in good faith over furloughs as an alternative to layoffs, and for unilaterally implementing procedures and criteria for reduction in force, displacements, and discharges of bargaining unit employees in violation of Section 89–13(a)(5)[ [5] ], HRS, . . .;

    d.  Refused to comply with provisions of chapter 89, including Sections 89–3, 89–9(a), (c) and (d), HRS, in violation of Section 89–13(a)(7)[ [6] ], HRS; and

    e.  Violated the terms of the unit 1 and 10 collective bargaining agreements . . . in violation of Section 89–13(a)(8) [ [7] ], HRS.

On September 16, 2009, UPW filed a complaint in the circuit court of the first circuit (the court) [8], alleging the following four counts against Defendants, as well as Linda Smith, chief policy advisor to Governor Lingle, and Georgina Kawamura, director of the Department of Budget and Finance:

## COUNT I—VIOLATIONS OF THE HAWAI'I WHISTLEBLOWERS' PROTECTION ACT

. . . .

75. Defendants' conduct alleged herein constitutes acts of retaliation, reprisal, and intimidation in violation of Hawaii's Whistleblowers' Protection Act and was undertaken knowingly, intentionally, maliciously, wantonly and oppressively.

76. By the aforementioned conduct and other acts and deeds to be established during the proceedings herein Defendants have violated the rights of employees under Section 378–62[ [9] ], HRS, for retaliatory

---

3.  HRS § 89–13(a)(1) provides that:

    (a) It shall be a prohibited practice for a public employer or its designated representative wilfully to:
    (1) Interfere, restrain, or coerce any employee in the exercise of any right guaranteed under this chapter[.]

4.  HRS § 89–13(a)(3) provides that it shall be a prohibited practice to:

    (3) Discriminate in regard to hiring, tenure, or any term or condition of employment to encourage or discourage membership in any employee organization[.]

5.  HRS § 89–13(a)(5) provides that it shall be a prohibited practice to:

    (5) Refuse to bargain collectively in good faith with the exclusive representative as required in section 89–9[.]

6.  HRS § 89–13(a)(7) provides that it shall be a prohibited practice to:

    (7) Refuse or fail to comply with any provision of [HRS Chapter 89.]

7.  HRS § 89–13(a)(8) provides that it shall be a prohibited practice to:

    (8) Violate the terms of a collective bargaining agreement[.]

8.  The Honorable Derrick H.M. Chan presided.

9.  HRS § 378–62 (Supp.2002) provides, in relevant part, as follows:

    **§ 378–62 Discharge of, threats to, or discrimination against employee for reporting violations of law.** An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:
    (1) The employee, or a person acting on behalf of the employee, reports or is about to report to the employer, or reports or is about to report to a public body, verbally or in writing, a violation or a suspected violation of:
    (A) A law, rule, ordinance, or regulation, adopted pursuant to law of this State, a political subdivision of this State, or the United States; or

threats, reductions in force, discrimination, discharge, and other unlawful adverse actions.

. . . .

## COUNT II—VIOLATIONS OF ARTICLE I, SECTION 4 OF THE HAWAII CONSTITUTION

81. The Hawai'i State Constitution, in Article I, Section 4, guarantees "the freedom of speech" and "the right of the people . . . to petition the government for a redress of grievances."[10] Included within the rights protected by Article I, Section 4 are the rights to object to and challenge illegal government action in a court action.

82. Plaintiff UPW and the employees UPW represents exercised their rights protected by Article I, Section 4 by seeking relief in the circuit court against illegal government action that would unilaterally implement mandatory unpaid furloughs of three days per month for all state employees for a two-year period.

83. Plaintiff UPW and the employees UPW represents exercised their rights protected by Article I, Section 4 in their capacity as citizens, rather than in the course of their official duties as public employees.

. . . .

86. By retaliating against UPW and its members for objecting to and reporting illegal government action, Defendants deprived UPW and its members of rights guaranteed by Article I, Section 4 of the Hawai'i Constitution.

> (B) A contract executed by the State, a political subdivision of the State, or the United States, unless the employee knows that the report is false[.]

10. The full text of Haw. Const. art. I, § 4 states:
   No law shall be enacted respecting an establishment of religion or prohibiting the free exercise thereof, or abridging the freedom of speech or of the press or the right of the people peaceably to assemble and to petition the government for a redress of grievances.

11. The Haw. Const. art. XVI, § 1 provides that:
   The employment of persons in the civil service, as defined by law, of or under the State, shall be governed by the merit principle.

## COUNT III—VIOLATIONS OF MERIT PRINCIPLES

. . . .

89. In *Konno v. County of Hawai'i*, 85 Hawai'i 61, 937 P.2d 397 (1997), the Hawaii Supreme Court held that the contracting out or privatization of services which have historically and customarily been performed by civil servants represented by UPW violates the merit principle.

. . . .

93. On and after June 30, 2009 Defendants have refused to terminate contracts which are contrary to public policy in contravention of Article XVI, Section 1 of the Hawaii State Constitution.[11]

94. Defendants, by the foregoing acts, and other acts to be established during the course of the proceeding herein have violated the merit principle mandated by Article XVI, Section 1 of the Hawaii State Constitution.

. . . .

## COUNT IV—VIOLATIONS OF CIVIL SERVICE LAWS

. . . .

96. HRS Chapters 76 and 77 require that all blue collar, non-supervisory positions and institutional, health and correctional positions within the State of Hawai'i, to be governed by the merit principles and that employees be hired and retained in accordance with the provisions thereof[.]

97. It is a fundamental requirement of the merit principle under Section 76-1[12], HRS, that civil servants be afforded reasonable job security.

12. HRS § 76-1 (Supp.2000) provides, in part, that:
   It is the purpose of this chapter to require each jurisdiction to establish and maintain a separately administered civil service system based on the merit principle. The merit principle is the selection of persons based on their fitness and ability for public employment and the retention of employees based on their demonstrated appropriate conduct and productive performance. It is also the purpose of this chapter to build a career service in government, free from coercive political influences, to render impartial service to the public at all times, according to dictates of ethics and morality and in compliance with all laws.

. . . .

100. The contracting out and privatization of corrections work by Defendants is not justified under Section 76–16, HRS

. . . .

102. Defendants violated the rights of employees under Section 76–43, HRS, by refusing to negotiate the criteria, procedures, timing, and manner of handling mass layoffs for reasons other than "lack of work" or lack of "funds" with UPW prior to unilateral implementation of the layoffs, reductions in force, and discharges of unit 1 and 10 employees.

. . . .

## B.

The relevant question is whether the court[13] properly granted Defendants' September 14, 2011 Motion to Dismiss. In granting the Motion to Dismiss, the court had determined that the facts in UPW's complaint were essentially the same as those alleged by the UPW in its "prohibited practice" claims brought before the HLRB. It stated that "it would be wholly inconsistent with HLRB's exclusive, original jurisdiction for the [court] to hear the same underlying factual disputes and allegations and create the possibility of inconsistent judgments." The court further concluded that "the statutory scheme mandates that those facts, allegations and claims raised by UPW in its prohibited practice complaint be heard to conclusion by the HLRB first and subject to judicial review by a court of competent jurisdiction operating in its appellate capacity[,]" and that it "lack[ed] primary subject matter jurisdiction [[14]]over [claims concerning potential prohibited practices], since exclusive, original jurisdiction over such controversies rests with the HLRB."

Finally, the court found that "to the extent that the instant complaint raise[d] constitutional or statutory claims over which the HLRB lacks subject matter jurisdiction to

address, such claims may be rendered moot in the event that the HLRB issues a ruling against UPW on the key factual and legal questions. . . ." On May 15, 2012, the court filed an order dismissing all of UPW's claims.

## C.

UPW subsequently appealed the circuit court's order to the Intermediate Court of Appeals (ICA). *United Public Workers, AFSCME, Local 646, AFL–CIO v. Lingle,* No. CAAP–12–0000505, 2013 WL 3063803, at *1 (App. June 18, 2013). The ICA first concluded that "this case raises issues within the HLRB's exclusive jurisdiction over prohibited practices controversies." *Id.* at *2. It also stated that "UPW correctly asserts its statutory claims could be raised directly in the circuit court." *Id.* at *5 (citing *Konno v. Cnty. of Hawai'i,* 85 Hawai'i 61, 937 P.2d 397 (1997)). The ICA then noted that "[w]hen a court and an agency have concurrent original jurisdiction to decide issues that have been placed within the competence of an administrative agency, the primary jurisdiction doctrine applies and a court should refer the issues to the agency before proceeding." *Id.* (citing *Fratinardo v. Employees' Ret. Sys.,* 121 Hawai'i 462, 468, 220 P.3d 1043, 1049 (App.2009)). Finally, the ICA concluded that primary jurisdiction applies, and that the court erred in dismissing the case rather than staying the claims pending the outcome of the HLRB proceedings. *Id.*

## II.

Contrary to the ICA and majority's holding, primary jurisdiction is not applicable to this case. Respectfully, the majority's formulation of the primary jurisdiction doctrine will enable courts to perfunctorily stay or dismiss claims for "primary jurisdiction" any time a particular claim or the "issues" underlying that claim are directly or tangentially related to an administrative agency.[15] Rath-

---

**13.** The Honorable Patrick W. Border presided over the September 14, 2011 Motion to Dismiss.

**14.** It is noted that "primary subject matter jurisdiction" is dissimilar from the "primary jurisdiction doctrine", which does not involve subject matter jurisdiction.

**15.** It is noted that the ICA has been applying the primary jurisdiction doctrine with some frequency. *See, e.g., UPW,* 2013 WL 3063803, at *5;

er than serving as a "catch-all," the primary jurisdiction doctrine should be reserved for the more limited cases where an agency, rather than a court, should determine "reasonableness" or other policy considerations, and where inconsistent judgments may result in policy conflicts.[16]

Our law is well-established that "primary jurisdiction presumes that the claim at issue is originally cognizable by both the court <u>and</u> the agency." *Pacific Lightnet, Inc. v. Time Warner Telecom, Inc.*, 131 Hawai'i 257, 269, 318 P.3d 97, 109 (2013) (emphasis in original) (citing *Aged Hawaiians v. Hawaiian Homes Comm'n*, 78 Hawai'i 192, 202, 891 P.2d 279, 289 (1995)). In determining what course to follow in that event, "the court must first determine whether the agency has exclusive original jurisdiction[.]" *Id.* "If not, and the court finds that it does possess jurisdiction over the matter, the court can then decide if it is appropriate to apply the doctrine of primary jurisdiction." *Id.* (citing Aaron J. Lockwood, Note, *The Primary Jurisdiction Doctrine: Competing Standards of Appellate Review*, 64 Wash. & Lee L. Rev. 707, 750–55 (2007)).

In deciding on whether to refer the case to the agency, the court must first decide whether the case " 'rais[es] issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion[.]' " *Id.* (quoting *Kona Old Hawaiian Trails Grp. v. Lyman*, 69 Haw. 81, 93, 734 P.2d 161, 169 (1987)). The question is "whether the claim presented 'falls squarely within the experience and expertise of courts generally[,]' " *id.* at 276, 318 P.3d at 116 (internal quotation marks and citation

omitted), or if, "instead, the claims are premised on 'technical matters calling for the special competence of the administrative expert[.]' " *Id.* (quoting *Aged Hawaiians*, 78 Hawai'i at 202, 891 P.2d at 289). Special competence relates "to the rationales behind the doctrine, to promote uniformity and to prevent courts from engaging in the types of policy-making decisions that administrative agencies must make." [17] *Id.* at 276, 318 P.3d at 116.

The second question for the court "is whether applying the primary jurisdiction doctrine will 'promote uniformity and consistency in the regulatory process.' " *Id.* at 278, 318 P.3d at 118 (quoting *Aged Hawaiians*, 78 Hawai'i at 202, 891 P.2d at 289). For example, in the context of public utility rate-making or interstate transportation carrier regulation, a decision by the court as to "reasonableness" could conflict with a particular policy of an administrative agency. *See, e.g., United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956) (stating that "because we regard the maintenance of a proper relationship between the courts and the [Interstate Commerce Commission] in matters affecting transportation policy to be of continuing public concern, we have been constrained to inquire [as to the reasonableness of rates]"). Consequently, "[t]he court's decision to invoke primary jurisdiction is reviewed on the basis of the[se] dual rationales underlying the primary jurisdiction doctrine." *Pacific Lightnet*, 275, 318 P.3d at 115.

Once a court has determined that the primary jurisdiction doctrine should be applied, a referral to the agency does not deprive the court of jurisdiction. *Reiter v. Cooper*, 507

---

*Hawai'i State Teachers Ass'n v. University Laboratory School*, No. CAAP12–0000295, —— Hawai'i ——, —— P.3d ——, 2013 WL 1578338 (App. April 15, 2013); *Pacific Lightnet, Inc. v. Time Warner, Inc.*, No. 28948, 2013 WL 310149 (App. Jan. 25, 2013); *Dancil v. Arakawa*, No. CAAP–11–0001020, 132 Hawai'i 472, 323 P.3d 116, 2012 WL 6003715 (App. Nov. 16, 2012); *Pavsek v. Sandvold*, 127 Hawai'i 390, 279 P.3d 55 (App. 2012).

**16.** Overuse of primary jurisdiction may result in undue delay to litigants because claims will be more frequently stayed pending administrative resolution. *See e.g., Pacific Lightnet*, 268, 318 P.3d at 108 (noting that " 'wise use of the [primary jurisdiction] doctrine necessitates a careful

balance of the benefits to be derived from utilization of agency processes as against the costs in complication and delay.' " (quoting *Ricci v. Chicago Mercantile Exch.*, 409 U.S. 289, 321, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973)).

**17.** The majority's test for when to apply primary jurisdiction seems to be, " 'whenever enforcement of the claim requires the resolution of issues, which, under a regulatory scheme, have been placed within the special competence of an administrative body.' " Majority opinion at 93, 734 P.2d at 168 (quoting *Kona Old*, 69 Haw. at 93, 734 P.2d at 168). This diminishes the doctrine, inasmuch as the agency's "special competence" has its own set of considerations, and other factors come into play as well. *See generally, Pacific Lightnet*, 276–78, 318 P.3d at 115–18.

U.S. 258, 268, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993). Instead, the court has discretion to retain jurisdiction, or dismiss without prejudice, so long as the parties would not be unfairly disadvantaged.[18] *Pacific Lightnet,* 271–72, 318 P.3d at 111–12 (citing *Fratinardo,* 121 Hawai'i at 469, 220 P.3d at 1050); *Reiter,* 507 U.S. at 268, 113 S.Ct. 1213.

### III.

The majority is concerned with the potential to subvert the statutory scheme of HRS Chapter 89, and hence the jurisdiction of the HLRB, through artful pleading. *See Hawai'i State Teachers Ass'n v. Abercrombie,* 126 Hawai'i 318, 322, 271 P.3d 613, 618 (2012) ("*HSTA* ") ("[T]he legislative purpose of providing the HLRB with exclusive original jurisdiction over chapter 89 complaints is frustrated if plaintiffs can recast their statutory claims as constitutional claims and proceed directly to circuit court.").

### A.

HRS § 89–14 provides:

Any controversy concerning prohibited practices may be submitted to the [HLRB] in the same manner and with the same effect as provided in section 377–9 [ (Supp. 2004) ]; provided that the [HLRB] shall have exclusive original jurisdiction over such a controversy, except that nothing herein shall preclude (1) the institution of appropriate proceedings in circuit court pursuant to section [89–12(c) ] or (2) the judicial review of decisions or orders of the [HLRB] in prohibited practice controversies in accordance with section 377–9 and chapter 91. All references in section 377–9 to "labor organization" shall include employee organization.

**18.** As explained *infra,* the majority's application of the doctrine concludes that UPW's claims raise policy issues that the HLRB should consider "in the interest of a uniform and expert administration of the regulatory scheme laid down by HRS Chapter 89." Majority's opinion at 200–01, 325 P.3d at 612–13 (emphases added). Respectfully, it is not at all clear how resolution of these specific claims either requires agency expertise, or will lead to a uniform regulatory scheme, and thus it is not evident why they "ought to be considered by the HLRB". *Id.*

(Emphases added.) The plain language gives "exclusive original jurisdiction" to the HLRB over prohibited practices "controversies", HRS § 89–14. Yet, despite HRS § 89–14, as will be discussed *infra,* the majority deems that some of UPW's allegations "present[ ] a prohibited practices controversy", majority's opinion at 200, 325 P.3d at 612, but concludes that the court also has jurisdiction over these claims.[19] Majority's opinion at 198, 325 P.3d at 610. This determination is directly contrary to the HLRB's "exclusive" jurisdiction over such controversies mandated by statute.

### B.

In *Hawai'i Government Employees Association v. Lingle,* 124 Hawai'i 197, 239 P.3d 1 (2010) (*HGEA* ), a majority of this court engaged in an extensive discussion of the legislative history of HRS § 89–14. *See* 124 Hawai'i at 203, 239 P.3d at 7. *HGEA* related the following relevant legislative history:

At the time *Winslow* [*v. State,* 2 Haw.App. 50, 625 P.2d 1046 (1981)] was decided, HRS § 89–14 provided: "Any controversy concerning prohibited practices may be submitted to the board in the same manner and with the same effect as provided in section 377–9. All references in section 377–9 to 'board' shall include the Hawaii public employment relations board and 'labor organization' shall include employee organization." 2 Haw.App. at 56–57, 625 P.2d at 1051 (quoting HRS § 89–14).[ ] However, in 1982, Hawaii's legislature amended HRS § 89–14 to "legislatively ... overrule[ ]" *Winslow* because it disagreed with the ICA's interpretation of HRS § 89–14 and HRS § 377–9. A standing committee report was issued by the Committee on Public Employment and

**19.** It is assumed that the majority's use of "first pass" means that the court stays the proceedings to allow the HLRB to resolve the underlying factual issues relating to prohibited practices controversies, rather than exclusive jurisdiction. But under such an approach, HLRB would have non-exclusive jurisdiction over prohibited practices controversies, rather than exclusive jurisdiction, in contravention of HRS § 89–14. As noted, HRS § 89–14 requires exclusive jurisdiction, to the exclusion of any other body exercising jurisdiction.

Government Operations that stated, in pertinent part, as follows:

The purpose of this bill is to make the jurisdiction of the [HPERB] in controversies relating to prohibited practices exclusive except as otherwise provided in Chapter 89, [HRS].

. . . .

Recently, the [ICA], in [*Winslow*], construed sections 89–14 and 377–9, HRS, and concluded that the jurisdiction of the [HPERB [20]] over controversies concerning prohibited (unfair labor) practices in the public sector is not exclusive, and that a prohibited practice complaint or action may be brought either before HPERB or in circuit court. In other words, the [ICA] concluded that under these two statutory sections, HPERB and the circuit courts have concurrent jurisdiction over prohibited practice complaints in the public sector.

By making the jurisdiction of HPERB exclusive in controversies concerning prohibited practices, this bill legislatively rectifies or overrules the judicial conclusion or statutory construction enunciated in [*Winslow*].

H. Stand. Comm. Rep. No. 134–82, in 1982 House Journal, at 943 (emphases in original, brackets added).

A separate standing committee report was issued by the Committee on Judiciary, which stated:

The purpose of this bill is to clarify that the [HPERB], rather than the courts, has primary jurisdiction over prohibited practice complaints filed under Chapter 89, Hawaii Revised Statutes.

A recent Hawaii Court of Appeals decision interprets Section 89–14 and 377–9, Hawaii Revised Statutes, to give HPERB and the circuit courts concurrent jurisdiction over prohibited practice complaints. This bill will make it clear that HPERB has exclusive original jurisdiction over prohibited practice com-

plaints. Appeals from HPERB will continue to be filed in Circuit Court.

H. Stand. Comm. Rep. No. 589–82, in 1982 House Journal, at 1164 (brackets added). As further explained by the Committee on Human Resources:

In 1970, the Legislature created the [HPERB] to administer the provisions of Chapter 89 in an effort to promote cooperative relations between the government and its employees and to protect the public by ensuring orderly government operations. Thus, the board was given jurisdiction of prohibited practice cases. Your Committee believes the original intent of this provision was to allow the board, who is the administrative agency with the expertise in public employment relations, to have primary jurisdiction of prohibited practice complaints. However, a recent Hawaii Court of Appeals decision interprets Section 89–14 and 377–9, Hawaii Revised Statutes, to give HPERB and the circuit court concurrent jurisdiction over prohibited practice complaints.

This bill will make it clear that HPERB has exclusive original jurisdiction over prohibited practice complaints. Appeals from HPERB will continue to be filed in Circuit Court.

S. Stand. Comm. Rep. No. 597–82, in 1982 Senate Journal, at 1202 (brackets added). As enacted, the pertinent portions of HRS § 89–14 were amended to read as it does today.[ ] See 1982 Haw. Sess. Laws Act 27, § 1 at 38.

In light of the foregoing, the legislature clearly intended for the HLRB to have exclusive original jurisdiction over prohibited practice complaints, and the ICA's contrary interpretation in *Winslow* was incorrect. *See, e.g.,* H. Stand. Comm. Rep. No. 134–82, in 1982 House Journal, at 943. *Id.* at 203–204, 239 P.3d at 7–8 (emphases added). Based on the above, it is abundantly clear that the majority in *HGEA* held that the legislature, in legislatively overruling *Winslow*,[21] intended that the HLRB have

---

20. The HPERB became the HLRB in 1985. *See* 1985 Haw. Sess. Laws Act 251, § 6 at 479–80.

21. It is also noted that "by legislatively overruling *Winslow,* the legislature did not divest the courts of the power to address constitutional

exclusive original jurisdiction, and that court involvement would be by way of <u>appeal</u> from the HLRB, filed in circuit court under HRS Chapter 91, or HRS § 377–9 [22]. *See id.* (citing S. Stand. Comm. Rep. No. 597–82, in 1982 Senate Journal, at 1202).

The majority states that "HRS Chapter 89 must be examined to determine whether it requires the HLRB to first pass on the controversy, which in turn depends on whether the controversy raises policy issues concerning matters that ought to be considered by the HLRB in the interests of a uniform and expert administration of the regulatory scheme laid down by HRS Chapter 89." Majority opinion at 199, 325 P.3d at 611. Respectfully, this analysis undermines the legislature's intention.

The question is simply whether the claim presented is a "<u>controversy</u> concerning prohibited practices." HRS § 89–14 (emphasis added). Plainly disputed issues would constitute a "controversy." Hence, a so-called "issue" is subsumed within a "controversy." [23] If a particular claim does present such a controversy, then the HLRB has <u>exclusive,</u> original jurisdiction to decide the controversy, and the circuit court has no original jurisdiction. However, once the HLRB has rendered a determination, a party may appeal to the circuit court pursuant to the procedures of HRS Chapter 91 and HRS § 377–9. *Id.* If the claim is not a "controversy concerning prohibited practices," then HRS § 89–14 will not provide the HLRB with jurisdiction. Pursuant to the language of the statute, the inquiry is straightforward and either the HLRB has exclusive original jurisdiction, or it does not. In light of HRS § 89–14, respectfully, the majority cannot have it both ways.

The majority concludes that "HRS § 89–14 expressly requires that the HLRB first pass on prohibited practice controversies." Majority opinion at 200, 325 P.3d at 612. However, the majority's interpretation effectively reads the word "exclusive" out of the statute, a word that was explicitly <u>added</u> by the legislature in 1985. *See* H. Stand. Comm. Rep. No. 134–82, in 1982 House Journal, at 943. Despite acknowledging that the legislature amended HRS § 89–14 in 1985, in order to invalidate *Winslow*'s conclusion that the HLRB had concurrent jurisdiction with the circuit court, majority's opinion at 220–21, 325 P.3d at 632–33, the majority goes on to <u>find concurrent jurisdiction in the HLRB and the court</u> over the claims in this case, in derogation of HRS § 89–14 and the legislative history overruling *Winslow* and establishing exclusive jurisdiction <u>only</u> in the HLRB.

It must be noted that every time the term "primary" is used in connection with the term "jurisdiction", it is not necessarily referencing the primary jurisdiction doctrine. *See, e.g.,* Nicholas A. Lucchetti, *One Hundred Years of the Doctrine of Primary Jurisdiction: But What Standard of Review is Appropriate for It?,* 59 Admin. L. Rev. 849, 853 (2007) (noting that "primary jurisdiction" is "neither primary nor jurisdictional"). The Reports cited to by the majority stating that "exclusive original jurisdiction" may also be referred to as "exclusive primary or initial jurisdiction[,]" *see* H. Stand. Comm. Rep. No. 134–87, in 1982 House Journal, at 944, stand for the proposition that the agency must first, *i.e.* "primari[ly]", or "initial[ly]", decide prohibited practices controversies, and that the circuit court may only decide such controversies on appeal via HRS Chapter 91 or HRS § 377–9, *i.e.,* secondarily.[24]

issues unless and until the statutory issues are decided by the HLRB." *HGEA,* 124 Hawai'i at 229, 239 P.3d at 33 (Acoba, J., dissenting).

**22.** HRS § 377–9(f) provides, in relevant part, that:
(f) Any person aggrieved by the decision or order of the [HLRB] may obtain a review thereof as provided in chapter 91 by instituting proceedings in the circuit court of the judicial circuit in which the person or any party resides or transacts business, subject, however, to the general provisions of law for a change of

the place of trial or the calling in of another judge.

**23.** "Controversy" is defined as "[a] disagreement or dispute[,]" or "[a] justiciable dispute." *Black's Law Dictionary* 379 (9th ed. 2009).

**24.** As noted *supra,* however, HLRB's determination over controversies involving prohibited practices is more than a "first pass", it is the exclusive, original forum for jurisdiction over those controversies. *See* HRS § 89–14.

## IV.

### A.

Respectfully, the majority relies on an issue/claim distinction that is not relevant for purposes of determining whether concurrent jurisdiction exists. *See* majority opinion at 201–02, 325 P.3d at 613–14. In the context of primary jurisdiction, a court may consider whether issues require resolution by an agency. *Kona Old,* 69 Haw. at 93, 734 P.2d at 168–69. However, this does not negate the initial requirement that a court have jurisdiction over such claims or issues. And, respectfully, it is unclear how the majority can conclude that the court and the HLRB share jurisdiction over the prohibited practices controversies in this case, where HRS § 89–14 gives HLRB exclusive original jurisdiction over "[a]ny controversy [presumably including, *arguendo*, an "issue"] concerning prohibited practices." (Emphasis added.)

For example, *Kona Old* considered whether a county planning director properly issued a special management permit, in accordance with the Costal Zone Management Act (CZMA). 69 Haw. at 84, 734 P.2d at 163. One of the questions addressed by this court was whether a statute allowing "any person or agency [to] commence a civil action alleging that any agency" breached the CZMA vested the circuit court with jurisdiction over the dispute. *Id.* at 92, 734 P.2d at 168. Importantly, *Kona Old* first noted that the cause of action, pursuant to the statute, "seemingly describes a claim 'originally cognizable in the courts.'" *Id.* at 93, 734 P.2d at 169 (quoting *W. Pac. R.R.,* 352 U.S. at 64, 77 S.Ct. 161). It explained that this was different from a situation where a claim is cognizable in the first instance by an administrative agency alone. *Id.* It was only then that *Kona Old* considered whether the issues needed to be resolved by the agency under the doctrine of primary jurisdiction. *Id.* Thus, under *Kona Old,* concurrent jurisdiction is a prerequisite to an application of primary jurisdiction.

Contrary to *Kona Old,* the majority concludes, referencing *Kona Old,* that "the agency and the court need not have concurrent jurisdiction over the claims, as long as the agency and the court <u>have concurrent jurisdiction over the issues</u> presented in the claims." Majority's opinion at 92, 734 P.2d at 167 (emphasis added). However, first, *Kona Old* held that there was concurrent jurisdiction over the *claims,* when it established that the cause of action presented a claim that was "cognizable in the courts." *Id.* at 93, 734 P.2d at 169 (citation omitted). *Kona Old* then considered whether certain "issues" should be resolved by the agency, but only <u>after</u> it established that there was concurrent jurisdiction over the claims.

The majority also cites to *Aged Hawaiians* in support of its issue/claim distinction. Majority opinion at 199, 891 P.2d at 286. However, no such distinction was made in *Aged Hawaiians* either. Instead, this court explained that the relevant claim was originally cognizable in the court. *Aged Hawaiians,* 78 Hawai'i at 202, 891 P.2d at 289 (stating that "the exhaustion of administrative remedies is not required as a prerequisite to bringing an action [in the court] pursuant to [42 U.S.C.] § 1983." (citation and internal quotation marks omitted)). <u>Then,</u> it considered whether the questions and issues presented should be referred to the agency, concluding briefly that "[d]eference to the agency is particularly inappropriate in cases like this one, in which the constitutionality of the agency's rules and procedures is <u>challenged</u> and questions are raised as to whether the agency has acted within the scope of its authority." *Id.* Thus, *Aged Hawaiians* first established original jurisdiction in the court, then considered whether it was appropriate to apply the primary jurisdiction doctrine. *See id.*

In sum, *Kona Old* and *Aged Hawaiians* obviously assumed that the court had jurisdiction and then went on to decide whether the primary jurisdiction doctrine was applicable. The operative question in this case, in contrast, is whether the court had jurisdiction in the first place. Respectfully, the majority does not first establish that the court had jurisdiction over the issues or claims. If such claims do in fact allege prohibited practices "issues", as the majority contends, the legislature has already deemed in HRS § 89–

14, that HLRB's jurisdiction over these "issues" is exclusive of the court.

Second, even assuming, *arguendo* that there is some distinction between "issues" and "claims" with respect to deciding whether concurrent jurisdiction exists between the court and the agency, it is clear in this case that the agency and the court do not have concurrent jurisdiction over the "issues" presented. If the "issues" in this case are "subsumed" within HLRB's claims as prohibited practices controversies, as the majority avers, majority opinion at 203, 325 P.3d at 615, then the HLRB <u>alone</u> would have jurisdiction over those "issues" subsumed within the "controversies" under HRS § 89–14, and the court could not retain concurrent jurisdiction.

### B.

Although characterized as "primary jurisdiction", the majority is essentially requiring that UPW <u>exhaust</u> its administrative remedies, by mandating that the HLRB decide certain issues as a "first pass", and only then allowing the court to render its decision. The concept of a "first pass", as used by the majority, is inimical to primary jurisdiction, and instead suggests that the UPW must submit issues to the agency for a decision before the court may consider any issues presented by UPW's complaint. There is no support for requiring a "first pass", as it is characterized.

Respectfully, such a position is detrimental to the parties and the public, and improper, inasmuch as "[t]he requirement that a party exhaust [its] administrative remedies comes into play where a claim is cognizable in the first instance by an administrative agency alone[.]" *Hawai'i Insurers Council v. Lingle*, 120 Hawai'i 51, 71–72, 201 P.3d 564, 584–

85 (2008) (internal quotation marks and citation omitted); *Kona Old*, 69 Haw. at 93, 734 P.2d at 169; *see also*, *HSTA*, 126 Hawai'i at 325, 271 P.3d at 620 (Acoba, J., dissenting). Here, under the majority opinions in *HSTA*, *HGEA*, and HRS § 89–14, the "issues" are cognizable in the administrative agency alone, and thus the majority appears to be applying a primary jurisdiction/exhaustion hybrid, which, respectfully, mixes the two distinct doctrines.

As discussed, it is well-established that the agency and the court have concurrent jurisdiction in order for the primary jurisdiction doctrine to apply. At the very least, the court must have subject matter jurisdiction, because it is the court that decides whether to stay or dismiss the action before it. And, the court must have concurrent jurisdiction in order to effectuate a stay of the proceedings. Therefore, the majority's holding that the court should stay the claims, pending a "first pass" by the HLRB, majority opinion at 202, 325 P.3d at 614, conflicts with its determination that the issues asserted in the Complaint were essentially prohibited practices issues, *see* majority opinion at 203, 325 P.3d at 615. For, the court could not retain jurisdiction to stay the action unless it had concurrent jurisdiction with HLRB, but conversely, in considering prohibited practices issues, the HLRB has exclusive jurisdiction. Clearly, then, where the agency, such as the HLRB, is said to have exclusive original jurisdiction over particular controversies, the primary jurisdiction doctrine is not applied.[25]

The majority's citation to *Reiter* in support of its assertion that the court had discretion to either retain jurisdiction or dismiss the case without prejudice, majority opinion at 202–03, 325 P.3d at 614–15, is, respectfully,

---

**25.** Although at one point, primary jurisdiction did apply where there was exclusive agency jurisdiction, that is no longer the case. Commentators have described a shift from the original conception of "primary jurisdiction" to the modern primary jurisdiction doctrine. <u>Compare</u> *Far E. Conference v. United States*, 342 U.S. 570, 573–74, 72 S.Ct. 492, 96 L.Ed. 576 (1952) <u>with</u> *W. Pac. R.R. Co.*, 352 U.S. at 62, 77 S.Ct. 161. "After *Far East Conference*, applying the primary jurisdiction doctrine is no longer equivalent to a finding of exclusive agency jurisdiction[.]"

Lockwood, *The Primary Jurisdiction Doctrine*, 64 Wash. & Lee L. Rev. at 713. Moreover, the U.S. Supreme Court, "provided lower courts the option of either to stay the proceedings while the agency action is pending, or to dismiss the proceedings entirely[,]" and thus, "<u>presumes that the claim is originally cognizable by both the court and agency[,]</u> because otherwise, "<u>dismissal would have been mandatory.</u>" *Id.* at 714 (emphasis added) (citing *Far E. Conference*, 342 U.S. at 576–77, 72 S.Ct. 492).

incorrect. The majority refers aspects of the claims to the HLRB as prohibited practices "issues," and yet, holds that the court still has jurisdiction to stay the claims. As explained, this is contrary to HRS § 89–14, which gives the HLRB exclusive original jurisdiction over prohibited practices "controver[sies]," thereby divesting the court of jurisdiction.

*Reiter* is distinguishable. In *Reiter*, the agency did not have exclusive original jurisdiction over the relevant policy issues on which the court could apply primary jurisdiction. 507 U.S. at 269, 113 S.Ct. 1213. It was also clear that the court in *Reiter* did have jurisdiction, so there was no difficulty presented by the court choosing whether to stay or to dismiss the case inasmuch as the court had jurisdiction to do so. *Id.* Hence, *Reiter*'s holding that the "[r]eferral of the issue to the administrative agency does not deprive the court of jurisdiction," *id.* at 268, 113 S.Ct. 1213, followed from its conclusion that the court had jurisdiction over the claims presented. Here, by contrast, the referral of any prohibited practices "controversies" to the HLRB would deprive the court of jurisdiction, because of the exclusive, original jurisdiction granted to the HLRB pursuant to HRS § 89–14. Thus, *Reiter* would hold, contrary to the majority's position, that the court in this case would have no jurisdiction to decide whether to effectuate a stay or dismiss the claims.

## V.

Moreover, the precedent of this court is plainly contrary to the application of primary jurisdiction in this case. First, the majority opinions in *HGEA* and *HSTA* were consistent in holding that only HLRB had jurisdiction, because it had exclusive, original jurisdiction, *i.e.*, that there was not concurrent jurisdiction with the court. Hence, logically, primary jurisdiction did not apply in either *HGEA* or *HSTA*. The majority in *HGEA* held that the HLRB had "exclusive original jurisdiction," 124 Hawai'i at 204, 239 P.3d at 8, over the statutory issues raised by the plaintiffs under HRS Chapter 89–9(a) and

(d), *id.* at 206, 239 P.3d at 10, but that the HLRB lacked jurisdiction to decide the constitutional issues presented. *Id.* at 207, 239 P.3d at 12.

The majority in *HSTA* held that "[t]he plaintiffs' complaint states claims relating to 'prohibited practices' because it ultimately challenges [the governor's] ability to unilaterally impose furloughs without collectively bargaining." 126 Hawai'i at 322, 271 P.3d at 617 (citation omitted). *HSTA* explained that "[d]eleting references to chapter 89 does not change the fact that the dispute ultimately relates to a prohibited practice[,]" and "[t]herefore, the plain language of HRS § 89–14 indicates that the HLRB has exclusive original jurisdiction over the plaintiffs' claims." *Id.* (emphasis added).

Second, the majority's conclusion that the privatization claims alleged in UPW's circuit court complaint are cognizable in the circuit court, majority's opinion at 202, 325 P.3d at 614, clashes with its determination that the primary jurisdiction doctrine applies to the retaliation claims.[26] The majority concludes that based on *Konno*, the HLRB "only has jurisdiction over issues related to chapter 89, such as collective bargaining and prohibited practices controversies, to the extent they do not violate merit principles." Majority opinion at 205, 325 P.3d at 617.

Respectfully, it is not clear how the majority's analysis is a determination that UPW's privatization claims "do not contain issues within the specialized expertise of HLRB." *Id.* at 204, 325 P.3d at 616. Instead, in *Konno*, this court decided whether the privatization efforts at issue violated civil services laws and merit principles. 85 Hawai'i at 78, 937 P.2d at 414. Having determined that there was a violation, *Konno* held that there was no need to reach the HRS Chapter 89 arguments, because "our collective bargaining statutes expressly state that parties are barred from negotiating upon and agreeing to proposals that violate merit principles." *Id.* The court had jurisdiction first to determine whether the privatization effort was contrary to law, because "collective bargain-

---

**26.** Accordingly, in connection with the privatization claims presented in this case, I concur with the majority as to the result, but not as to the rationale.

ing statutes do not require negotiation over topics that are contrary to duly enacted laws." *Id.* Thus, *Konno* clearly holds that the circuit court had jurisdiction to determine the validity of privatization efforts under civil service laws and merit principles, without consideration of whether such issues were within the "specialized expertise" of the HLRB.

Accordingly, the majority's application of the primary jurisdiction doctrine is not supported in this case. The discussion does not take into account the fundamental jurisdictional prerequisites that must be established before the doctrine can be considered as a possibility in any given case.

## VI.

As noted, UPW alleges two claims in its complaint with respect to retaliation; first, that the Defendants' actions violated the employees' rights as guaranteed by the Free Speech Clause, Haw. Const. art. I, § 4, and second, that the Defendants' actions constituted acts of retaliation, reprisal, and intimidation in violation of the HWPA. Both of these claims are unquestionably cognizable before the court alone, and thus there is no need to turn to primary jurisdiction.

### A.

#### 1.

As to constitutional claims, it is axiomatic that administrative agencies do not have jurisdiction to decide constitutional claims. Count II of UPW's complaint specifically alleged a constitutional violation of article I, section 4 of the Hawai'i constitution, specifically that, "[b]y retaliating against UPW and its members for objecting to and reporting illegal government action, Defendants deprived UPW and its members of rights guaranteed by Article I, Section 4 of the Hawai'i Constitution." [27] As in *HGEA* and *HSTA*, UPW's allegations manifestly challenged the constitutionality of actions taken by Defendants. *See HGEA*, 124 Hawai'i at 218, 239 P.3d at 22 (Acoba, J., dissenting); *HSTA*, 126

Hawai'i at 323, 271 P.3d at 618 (Acoba, J., dissenting).

Just as in those two cases, the court here had jurisdiction over the constitutional question presented by UPW. This court has held that "[a]lthough an administrative agency may always determine questions about its own jurisdiction it generally lacks power to pass upon the constitutionality of a statute." *HOH Corp. v. Motor Vehicle Indus. Licensing Bd.*, 69 Haw. 135, 141, 736 P.2d 1271, 1275 (1987) (internal brackets, quotation marks, and citations omitted); *Morgan v. Planning Dep't., Cnty. of Kauai*, 104 Hawai'i 173, 184, 86 P.3d 982, 993 (2004) "[a]n administrative agency can only wield powers expressly or implicitly granted to it by statute." (internal quotation marks and citation omitted).

In *HGEA*, the union alleged a constitutional claim in a complaint to the circuit court. 124 Hawai'i at 212, 239 P.3d at 16. As noted, the majority in *HGEA* characterized the complaint as alleging a prohibited practice, and held that HLRB had exclusive original jurisdiction. *Id.* at 205, 239 P.3d at 9. However, it did not explain how HLRB could have jurisdiction over the union's complaint, because HLRB has no jurisdiction over constitutional issues. *See id.* at 225, 239 P.3d at 29 (Acoba, J., dissenting). The dissent noted that "[g]iven that [the union's] complaint plainly alleged that the [provision at issue] was unconstitutional and the HLRB lacks any jurisdiction over constitutional matters, the HLRB could not have original exclusive jurisdiction over [the union's] complaint." *Id.* at 225–26, 239 P.3d at 29–30. Similarly, here, UPW's Complaint plainly alleges that Defendants' actions were unconstitutional, and thus the HLRB lacks jurisdiction, because there is no way in which HLRB could have original exclusive jurisdiction over UPW's constitutional claim. *See id.*

Moreover, "the determination of the [constitutional] issue is not only of primary, but of paramount importance, inasmuch as any supposed separate HLRB prohibited practice

---

27. It may become appropriate to resolve UPW's claim under art. 1, § 4 on a motion for summary judgment. However, this has no bearing on the court's original jurisdiction to hear the constitutional claim.

decision would <u>always</u> be subject [to] and inferior to the resolution by the court and this court of the constitutional question." *Id.* at 229, 239 P.3d at 33. While this court has noted that " 'deference will be given to decision of administrative agencies acting within the realm of their expertise[,]' " *id.* (quoting *Maha'ulepu v. Land Use Comm'n,* 71 Haw. 332, 335, 790 P.2d 906, 908 (1990)), "such deference does not extend to matters over which the agencies <u>do not have jurisdiction</u>[,]" including constitutional claims. *Id.* (emphasis added).

In the event that UPW had alleged its Free Speech claim before the HLRB, the agency would have been powerless to declare Defendants' actions "unconstitutional" or "constitutional", and thus, inasmuch as HLRB could *not* have provided a remedy, the court had jurisdiction over the constitutional Free Speech claim as alleged in UPW's complaint. Thus, the majority's characterization of UPW's complaint as alleging "prohibited practices" is incorrect. *See HSTA,* 126 Hawai'i at 324, 271 P.3d at 619 (Acoba, J., dissenting) (noting that the court had sole and exclusive jurisdiction over the constitutional claims presented, despite the majority's recharacterization of those claims as an HRS Chapter 89 action). UPW properly pled a claim under article 1, section 4 of the Hawai'i Constitution, and accordingly, should be able to seek the remedies available under the Hawai'i Constitution in a timely manner.[28]

### 2.

This case poses the problem of delay when a claim that only the circuit court can remedy is incorrectly referred to an administrative agency before the circuit court is permitted to exercise its original exclusive jurisdiction.

*See, e.g., HGEA,* 124 Hawai'i at 223, 239 P.3d at 28 (Acoba, J., dissenting) (noting that "requiring HGEA to seek a determination from the HLRB on whether the Governor's actions were a prohibited practice before it could seek injunctive relief from the court would result in unjustifiable delay," where the court was the only entity that could have granted such relief "in conjunction with the constitutional question"); *HSTA,* 126 Hawai'i at 323, 271 P.3d at 618 (Acoba, J., dissenting) (explaining that requiring the parties to engage in proceedings before the HLRB before the constitutionality of the Governor's actions could be considered "invites the possibility of unnecessary delay and a waste of judicial and party resources"). Moreover, unlike in *HSTA* and in *HGEA,* a prohibited practices action has already been filed before the HLRB in the instant case and was pending for two years before UPW filed its Complaint with the court, and no final decision to date has been made by the HLRB. Therefore, there is no final agency action from which UPW could appeal pursuant to HRS Chapter 91. Respectfully, this case exemplifies why the approach chosen by the majority will only promote more cost and delay, to the parties' and the public's detriment.

### 3.

UPW did not raise any statutory claims under HRS Chapter 89, and thus under the majority's holding, there are no clear parameters as to what the HLRB must decide with respect to "prohibited practices." Is the majority suggesting that the court wait until UPW's HLRB Complaint is addressed in full, or should it simply wait until the agency has made a separate determination on the factual issues that it states are implicated? Regardless, HLRB's Complaint does not present

---

28. This court has taken jurisdiction over alleged constitutional violations in other cases, without requiring that the parties first submit those claims as prohibited practices to the HLRB. For example, in *United Public Workers, AFSCME, Local 646, AFL–CIO v. Yogi,* 101 Hawai'i 46, 62 P.3d 189 (2002), the question was whether employment terms affecting wages, hours, and other conditions should have been subject to collective bargaining as required by the constitution. 101 Hawai'i at 48, 62 P.3d at 191. This court did not first require a ruling from the HLRB before deciding the constitutional issue. *See id.* at 54, 62 P.3d at 197. Similarly, in *Malahoff v. Saito,* 111 Hawai'i 168, 140 P.3d 401 (2006), the plaintiffs challenged the implementation of an "after-the-fact" payroll plan that had the effect of delaying the dates on which certain public employees were paid. 111 Hawai'i at 171, 140 P.3d at 404. On appeal, *Malahoff* determined whether the measure violated the employees' constitutional right to collective bargaining, without first requiring that the HLRB decide an alleged prohibited practice issue. *Id.* at 181, 140 P.3d at 414.

"prohibited practices", and while this court may "decide the legal limits within which the parties may act," the "choices they should make within those limits and what would be in their best interest to effectuate once the law is applied, is prudently and lawfully committed to them." *County of Kaua'i ex rel. Nakazawa v. Baptiste*, 115 Hawai'i 15, 60, 165 P.3d 916, 927 (2007) (Acoba, J., dissenting, joined by Duffy, J.). As in other cases, the claim should be allowed to be decided in court, rather than being pre-characterized by this court, thus giving due consideration to the good faith requirement binding on every pleader.

### B.

#### 1.

As to the HWPA violation alleged, the court also clearly had sole original jurisdiction over UPW's claim. The HWPA, at HRS § 378–63, states as follows:

(a) A person who alleges a violation of this part may bring a civil action for appropriate injunctive relief, or actual damages, or both within two years after the occurrence of the alleged violation of this part.

(b) An action commenced pursuant to subsection (a) may be brought in the circuit court for the circuit where the alleged violation occurred, where the complainant resides, or where the person against whom the civil complaint is filed resides or has a principal place of business.

(c) As used in subsection (a), "damages" means damages for injury or loss caused by each violation of this part, including reasonable attorney fees.

(Emphases added.)

The legislature manifestly intended for plaintiffs to bring actions enforcing the HWPA, HRS §§ 378–61 to 378–69, in court. Under the plain language of HRS § 378–62, the Act protects all "employees" against changes in the "employee's compensation, terms, conditions, location, or privileges of employment" in retaliation for reporting a violation of law. To enforce such violations, "a person who alleges a violation" "may [bring an action] in the circuit court where the alleged violation occurred, where the

complainant resides, or where the person against whom the civil complaint is filed resides or has a principal place of business." HRS § 378–63. Finally, under HRS § 378–64, "[a] court, in rendering a judgment in an action brought pursuant to this part, shall order" remedies "as the court considers appropriate[.]" (Emphases added.)

Thus, the plain language of the HWPA provides that any "person" alleging a violation of the Act "may" sue in either the circuit court where the alleged violation occurred, or the circuit court where the complaint resides, or the circuit court where the defendant resides, but the complainant must sue in one of these courts. Moreover, the subsequent section plainly contemplates that a court will issue remedies for violations of the Act. Thus, the plain language of the statutes mandates that plaintiffs enforcing violations would sue in court.

Additionally, the language used by the legislature in broad and all-inclusive, indicating that all persons, including employees, were entitled to sue in court for violations of the HWPA. Had the legislature intended to allow such actions to also be enforced in the HLRB with respect to employees, it would have said so, but did not. Thus, HWPA manifestly applies even in those situations in which employee grievances would be governed by collective bargaining agreements ostensibly within the jurisdiction of the HLRB.

#### 2.

This conclusion is reinforced by the Act's legislative history, which explained that Act "provides an employee with a basis for going to court to seek an injunction or other redress for unfair retaliation." S. Stand. Comm. Rep. No. 711, in 1987 Senate Journal, at 1442 (emphases added). Moreover, the legislative history indicates that the HWPA was intended to govern a wide spectrum of conduct inclusive of matters otherwise related to collective bargaining in public employment under HRS Chapter 89.

In HRS § 89–1, the legislature "declare[d] that it is the public policy of the State to promote harmonious and cooperative relations between the government and employees and to protect the public by assuring effec-

tive and orderly operations of government." These polices were "best effectuated" by, *inter alia,* "[r]ecognizing the right of public employees to organize for the purpose of collective bargaining." HRS § 89–1(b)(1). Thus, HRS Chapter 89 generally governs disputes between the government and its employees related to collective bargaining.

In contrast, the legislative history of the HWPA indicates that "the purpose of the [HWPA] is to prohibit retaliatory employment actions against employees in the private and public sectors who either report suspected violations of law or rule to government authorities or who are asked to participate in investigative efforts of our government." H. Stand. Comm. Rep. No. 25, in 1987 House Journal, at 1090; *accord* S. Stand. Comm. Rep. No. 711, in 1987 Senate Journal, at 1442. Plainly, government employees may "report suspected violations of law or rule" that are related to the collective bargaining process or to "harmonious and cooperative relations between the government and employees." Thus, it is apparent that the scope of conduct the legislature intended to prohibit under the HWPA includes conduct covered by HRS § 89–1, and that actions for violation of such conduct under the HWPA must be brought in court. Hence, the Act's legislative history confirms that the legislature intended that actions under the Act would be brought in court despite the existing governance procedures under collective bargaining agreements that would be within the ostensible jurisdiction of the HLRB.

### 3.

As demonstrated above, the language and legislative history of the HWPA do not admit of extracting the prohibited practices "issue" for the so-called "first pass" by the HLRB. To reiterate, the language of the Act states that actions must be brought in court, and the legislative history confirms that such actions were intended to be heard by the courts. To permit the HLRB to make a so-called "first pass" on some of the issues pivotal to resolve the HWPA claim would frustrate the legislative intent that such claims would be resolved in court.

Additionally, HRS § 378–62 provides that "[a]n employer shall not discharge, threaten,

or otherwise discriminate against an employee." (Emphases added.) Similarly, the legislature noted that the HWPA covers "retaliatory employment actions against employees in the private and public sectors[.]" *see* H. Stand. Comm. Rep. No. 25, in 1987 House Journal, at 1090 (emphasis added). Thus, it was apparent to the legislature that the issues raised in HWPA claims could relate to disputes between employees and the government regarding collective bargaining, *i.e.,* those issues covered by HRS Chapter 89. The legislature nevertheless determined that such issues should be heard by the courts. To require that the HLRB resolve issues central to the HWPA claim would therefore undermine the legislature's rejection of this option. In fact, the statute refers to conflict between employers and employees without ever mentioning the HLRB, and the legislative history indicates the legislature specifically intended that the HWPA cover retaliatory employment actions against employees in the "public sectors". *Id.* Thus, it is apparent that the legislature considered the scenario wherein employees would bring a HWPA claim based on conflicts with the government but nevertheless determined that such claims should be brought in court.

Consequently, the crux of the HWPA claim may not be decided outside of the court. The statute provides for the circuit court resolution without reference to HLRB, and an HWPA claim is not the type of claim over which the HLRB would have any specialized expertise on predicate factual issues. Instead, the legislature required that actions brought under the HWPA be filed, and thus plainly be tried, in the circuit court.

In sum, the majority incorrectly characterizes UPW's HWPA claim as a "prohibited practices" issue, where the jurisdiction over HWPA claims is firmly committed to the court. In mandating that such a claim be referred to the HLRB, the majority abrogates the express statutory right to file a claim under the HWPA in court, a right given to plaintiffs by the legislature in its enactment of the HWPA.

### VII.

Respectfully, similar to *HSTA,* here, there is a fundamental defect in allowing the court

to stay its proceeding, pending an HLRB determination, where, on the other hand, the majority has determined that HLRB has exclusive original jurisdiction over the dispute. *See id.* at 323, 271 P.3d at 618. As noted *supra,* a court cannot stay a claim unless it has concurrent jurisdiction over that claim. Further, a court may not "refer" a claim to an agency if that agency has no jurisdiction over the claim, such as in this case, where HLRB can have no jurisdiction over constitutional claims or the HWPA. Instead, as discussed, concurrent jurisdiction should be a prerequisite to the application of the primary jurisdiction doctrine.

## VIII.

There are two systems of decision-making implicated by this case. The first is the court, which, as explained, has exclusive original jurisdiction over the claims presented in UPW's Complaint. The second is the HLRB, which has exclusive original jurisdiction over the claims presented by UPW's HLRB Complaint, pursuant to HRS § 89–14.

Inasmuch as there were parallel proceedings in this case, or where there might be in other cases in the future, the doctrine of collateral estoppel would apply to prevent relitigation of issues decided by the agency and the court, and vice versa. "Res judicata, or claim preclusion, and collateral estoppel, or issue preclusion, are doctrines that limit a litigant to one opportunity to litigate aspects of the case to prevent inconsistent results and multiplicity of suits and to promote finality and judicial economy." *Eastern Savings Bank, FSB v. Esteban,* 129 Hawai'i 154, 158, 296 P.3d 1062, 1066 (2013) (citation omitted). "[I]ssue preclusion ... prevents the parties or their privies from relitigating any issue that was actually litigated and finally decided in the earlier action." *Id.* (citation omitted).

If HLRB decides facts pertaining to the subject matter before the court, then the only question is whether collateral estoppel would apply. If either forum rendered a judgment as to the merits, then that judgment would prevent the parties from relitigating particular issues in the other forum. Of course, should the HLRB render a judgment first, UPW could appeal to the circuit court as provided in HRS Chapter 91. Although, in effect, the decision would be rendered by the forum which first decides the case, that is the risk that UPW assumed when it decided to file both an HLRB Complaint and a Complaint in the circuit court. The doctrine of collateral estoppel would therefore prevent relitigation of issues in this case, and accordingly, would act as a barrier to inconsistent judgments as between the court and agency.[29]

## IX.

In accordance with the above, I would hold that all of UPW's claims as alleged in its Complaint are originally, exclusively cognizable in the court. I therefore concur in part and dissent in part.

---

**29.** As such, the majority's concern with inconsistent decisions is not valid on this basis as well. *See* majority's opinion at 201, 325 P.3d at 613

(noting that part of its decision was based on "avoiding the risk of divergent decision between an administrative agency and a court").